IN THE SUPREME COURT OF NORTH CAROLINA

No. 446A13

Filed 8 June 2018

STATE OF NORTH CAROLINA

v.

MARIO ANDRETTE McNEILL

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Judge James Floyd Ammons Jr. on 29 May 2013 in Superior Court, Cumberland County, upon a jury verdict finding defendant guilty of first-degree murder. Heard in the Supreme Court on 9 May 2017 in session in the Old Chowan County Courthouse (1767) in the Town of Edenton pursuant to N.C.G.S. § 7A-10(a).

*Joshua H. Stein, Attorney General, by Anne M. Middleton and Derrick C. Mertz, Special Deputy Attorneys General, for the State.*

*Glenn Gerding, Appellate Defender, and Andrew DeSimone, Benjamin Dowling-Sendor, and Daniel Shatz, Assistant Appellate Defenders, for defendant-appellant.*

HUDSON, Justice.

Defendant Mario Andrette McNeill appeals his conviction and sentence of death for the first-degree murder of Shaniya Davis. Defendant was found guilty of first-degree murder based on malice, premeditation, and deliberation, and under the felony murder rule, with the underlying felonies being sex offense of a child and kidnapping. Defendant was also convicted of related charges of sexual offense of a

child by an adult offender, taking indecent liberties with a child, first-degree kidnapping, human trafficking, and subjecting the victim to sexual servitude. We find no error in defendant's trial or sentencing, and we further determine that defendant's sentence of death is not disproportionate to his crimes.

Background

The evidence at trial tended to show that in September 2009, Shaniya Davis was five years old and, along with her mother, Antoinette Davis, and her seven-year-old brother, C.D., lived in the trailer of Antoinette's sister, Brenda Davis, located in Sleepy Hollow Trailer Park (Sleepy Hollow) in Fayetteville, North Carolina. Brenda had previously "been seeing" defendant, who also went by the nickname "Mano,"[1] and he had given her the deposit to move into the Sleepy Hollow trailer. Because defendant spent time at the trailer, he knew Antoinette and had been in the presence of Shaniya and C.D. before, and he also knew how to get into the trailer, even when the door was locked. At the time of the events at issue, Brenda was "seeing" Jeroy Smith, the father of her children. Brenda, Jeroy, and their children stayed in the back bedroom, while Antoinette and her children stayed in the front room of the trailer. Defendant lived with April Autry, the mother of his eighteen-month-old daughter, on Washington Drive in Fayetteville.

---

[1] Because defendant is referred to as "Mano" in the transcript, we use that spelling here; however, in a police interview, he explained that he was known as "Mono," which people confused with the "kissing disease."

On the evening of 9 November and continuing into the early morning hours of 10 November 2009, after ingesting cocaine and "a couple shots of liquor," defendant began "text[ing] all the females in [his] phone." He tried to text Brenda, but her phone was turned off. Another woman, Taisa McClain, who also lived in Sleepy Hollow, began exchanging text messages with defendant and agreed to invite him over; however, by the time defendant arrived at Sleepy Hollow at 2:52 a.m. on 10 November, Taisa had fallen asleep and did not answer defendant's texts. At 3:06 a.m., defendant texted "Goodnight" to Taisa and then at 3:07 a.m., defendant again attempted to text Brenda.

At around 5:30 a.m., Brenda woke up because she thought she heard the bedroom door open, and she mentioned this to Jeroy. Brenda and Jeroy went back to sleep but were reawakened at around 6:00 a.m. by Antoinette, who came into the room and asked if they had seen Shaniya. When they responded in the negative, Antoinette told them she was going outside to search for Shaniya. While Antoinette was outside, C.D. told Brenda and Jeroy that defendant had been there the previous night. Jeroy asked C.D. if he was sure about this, and C.D. responded, "yeah." Brenda texted and called defendant, but he did not answer his telephone. Jeroy then called April Autry, who told him that defendant was not with her.

Antoinette returned to the trailer and reported that she had knocked on doors in Sleepy Hollow but that no one had seen Shaniya. Brenda told Antoinette to call the police, but Antoinette was hesitant to do so. Brenda and Jeroy went outside and

noticed that the stairs and railings of the trailer contained feces that had not been there the night before. There was also what appeared to be illegible yellow writing scribbled within the feces on a railing.

Shortly after 6:00 a.m. that same morning, defendant arrived at the Comfort Inn & Suites (Comfort Suites) in Sanford where he entered the hotel alone, provided identification, and checked into Room 201 under his own name. There was video footage of the transaction because cameras operated continually throughout the hotel.[2] Defendant told the front desk clerk, Jacqueline Lee, that he was traveling with his daughter to take her to her mother in Virginia. Video footage from hotel security cameras showed that after checking in, defendant returned to his vehicle in the back of the parking lot at approximately 6:17 a.m, where he remained for several minutes, before coming back into the hotel carrying a child covered up with a blue blanket. Lee observed defendant carrying the child on the video feed and noticed the texture of her hair, which Lee recalled when she saw an Amber Alert that was issued for Shaniya. Additionally, Seth Chambers, who was staying at the hotel during a business trip, passed defendant in the hallway near Room 201 at 6:24 a.m. and observed defendant carrying a child.

---

[2] The general manager of the hotel, Angela Thompson, testified at trial and explained that because the cameras are manually programmed, the time varies slightly between separate cameras, but by no more than a minute apart. Additionally, Thompson testified that on 10 November she had not yet changed the time on the recorders to reflect the recent daylight savings time change on 1 November 2009; as a result, the time stamps on the video recordings were one hour ahead of the actual time. For clarity, we refer simply to the actual time.

At the hotel's morning shift change, Regina Bacani replaced Lee at the front desk. During the shift change, defendant came to the breakfast area alone, got a banana, some juice, and a muffin, and took them back to his room. Lee pointed defendant out to Bacani and told her about the recent check-in. Hotel cameras showed defendant walking toward the breakfast area at 6:36 a.m. and returning down the hall and into his room with food and drink in his hands.

Back at Sleepy Hollow, Antoinette called the police at 6:52 a.m. at the urging of Brenda. About ten minutes after Antoinette's telephone call, the police arrived, began searching for Shaniya with canines, and started interviewing people. Fayetteville Police Officer Elizabeth Culver observed a substance that was later determined to be feces on both railings of the front porch. The substance was smooth, like something had been poured on it. Antoinette Davis had a cooking pot in her hand when Officer Culver arrived, and someone said Antoinette had poured water on the railings, so Officer Culver asked her not to do that. In the trash can of unit 1119, police found a blanket that Antoinette Davis identified as hers and which Jeroy Smith recognized as having been in the living room of the trailer recently. The blanket was a thick child's comforter-type blanket, and it had feces on it. Jennifer Slish, a forensic technician for the Fayetteville Police Department at that time, took the blanket into evidence to be processed for fluids, fibers, and hairs.

Officer Culver spoke with Antoinette, Brenda, Jeroy, and C.D. at the scene. C.D. seemed very distracted and would look at his aunt before responding. C.D. said

he remembered Shaniya coming to bed but did not remember her leaving the bedroom. At trial, C.D. ultimately testified that he had seen defendant at the trailer that morning. Because Antoinette and Brenda were consistently looking at their phones and texting, Officer Culver had difficulty getting them to focus on the questions being asked, so her Lieutenant agreed to take them downtown to be interviewed. Officer Culver and her partner, Daniel Suggs, went to the main office of the trailer park to view the security video so as to look for a child roaming around the trailer park or for vehicles coming into the area.

At approximately 7:34 a.m., the video cameras at the Comfort Suites showed defendant leaving Room 201 and going to the elevator with a child later identified as Shaniya. At 7:35 a.m., the video shows defendant exiting the side door of the hotel and walking down the sidewalk still carrying Shaniya. Matthew Argyle, the hotel's maintenance worker at the time, appeared on the video one minute later. Argyle later testified that he was outside the side door picking up cigarette butts and trash when he saw defendant come out with a five- or six-year-old female child on his shoulder. Defendant had her covered, and Argyle thought she was asleep. When Argyle said hello, defendant made eye contact with him before looking away without saying anything in response and continuing walking toward the parking lot. Argyle "noticed something was amiss," and he thus tried to observe defendant without making it obvious that he was doing so. Defendant put the child in the right rear passenger side of his car, got into the driver's seat, and began smoking a cigarette or

cigar. Argyle continued to watch defendant while acting like he was doing busy work, because he just felt something was amiss. Defendant then drove to the pavilion at the front entrance of the hotel, extinguished his smoking material, and entered the hotel.

Defendant approached the front desk and asked Bacani for his security deposit, stating that he had to get back on the road to drive his daughter to Virginia to meet her mother. Security cameras show Bacani giving defendant the cash receipt to sign and returning the deposit. The housekeeper who later cleaned Room 201 brought Bacani one or two small, clear, open plastic packets with white residue that she had found in the room, which Bacani believed to be cocaine.

Meanwhile, Argyle watched defendant leave the hotel entrance, get back in his car, drive away, and turn left onto the main road. Argyle did not act on his feeling that something was wrong until the following day when hotel staff saw an Amber Alert and called law enforcement. The hotel security cameras show defendant leaving the hotel's front entrance and getting into his car at 7:40 a.m., after which the car turned left towards Highway 87.

Telephone records indicate that at approximately 7:49 a.m., defendant sent a text saying "Hey" to Brenda Davis, who was at the police station at this time and had texted "Hey" to defendant at 6:53 a.m. after learning from C.D. that defendant had been in the trailer the previous night. At approximately 8:22 a.m., cell phone tower pings showed defendant's phone to be near the intersection of Highway 87, Highway

24, and Highway 27 in an area known as the Johnsonville and Barbeque area of Highway 87. At approximately 8:33 a.m., Brenda sent a text message to defendant stating, "U been 2 my house." At 8:35 a.m., defendant responded to Brenda, "No [wh]y." Brenda sent a return message at 8:37 a.m. stating, "U lyin," to which defendant responded, "No can i come though." At 8:39 a.m., Brenda responded, "Hell no." At 8:40 a.m., defendant sent a message to Brenda stating, "Dam its [sic] like that." At 8:41 a.m., defendant sent a message to Brenda adding, "Him there." At 8:47 a.m., Brenda sent a message to defendant telling him, "Dont text me no mo [sic]." At 8:50 a.m., defendant sent a message to Brenda saying, "Sure what ever." At 9:19 a.m., defendant sent a message to Brenda inquiring, "[Wh]y [your] baby dad call my baby ma askin 4 me." At 9:48 a.m., defendant sent a final message to Brenda asking, "What da hell is going on." Brenda testified that she did not tell law enforcement she was text messaging defendant during the same time she was at the station because she "didn't want to assume" anything at that point. For the same reason, she did not immediately tell police what C.D. had said about seeing defendant in the trailer.

Bacani finished working at the Comfort Suites at 3:00 p.m. and reported back for the 7:00 a.m. shift change the next day, 11 November 2009. Bacani and Lee then noticed an Amber Alert on the hotel's computer screen. Lee thought the picture shown on the screen was that of the same child she had observed with defendant the previous morning, and accordingly, she called the Amber Alert hot line. Slish, the forensic technician, responded to the call and processed Room 201 for evidence. The

hotel manager advised Slish that the bedding had not been changed but that the trash had been taken out and a towel had been removed before staff became aware of the situation. Two comforters from the beds in Room 201 were among the evidence Slish collected.

Charles Kimble, who was at that time a Captain in the Fayetteville Police Department and in charge of its investigation bureau, was responsible for the logistics of trying to find Shaniya. Based on the video from the hotel, police believed that defendant had been with Shaniya and that she was still alive. After obtaining defendant's cell phone number from his mother, police gave the number to FBI Special Agent Frank Brostrom, who began an analysis of defendant's phone.

Brostrom testified that the National Center for Missing and Exploited Children had already notified the FBI about the case. According to Brostrom, when the FBI receives a notification of a missing child, agents immediately contact local law enforcement to offer assistance. Brostrom contacted Sergeant Chris Courseon of the Fayetteville Police Department, who quickly invited Brostrom to come and help with the search for Shaniya. Brostrom arrived at Sleepy Hollow on the afternoon of 10 November.

In exigent circumstances, including situations when young children are missing, the FBI can make a showing of imminent danger of serious bodily injury or death and thereby obtain from communications carriers information such as telephone data, "GPS, toll records," and cell tower records. Brostrom had already

telefaxed exigent circumstance requests to telephone companies to obtain information on phone numbers belonging to Brenda Davis, Antoinette Davis, and an associate of theirs, and on 12 November, Brostrom made a request for information regarding defendant's phone number. Brostrom quickly obtained information associated with defendant's cell phone including call details, cell phone tower locations, and text messaging, with longitudes and latitudes for the cell towers for which the phone number would have pinged.

Defendant's cell phone data were analyzed by Special Agent Michael Sutton of the FBI's Cellular Analysis Survey Team (CAST). CAST assesses cellular telephone records and applies the cell tower and sectors utilized by a particular phone to map its location. When Sutton received the electronic information from defendant's cell phone, he performed an initial analysis, created some rough draft maps, and provided Brostrom an initial search area in the Highway 87 area along Highway 27. Following the FBI's recommendation, police began searching for Shaniya in the area around Highway 87 from Spring Lake toward Sanford. Having received offers of assistance from volunteers and different law enforcement agencies, investigators mobilized a huge search and rescue effort.

After the hotel video showing defendant with a child believed to be Shaniya came to light, Brenda Davis and Jeroy Smith told police that C.D. had seen defendant at the trailer the night Shaniya disappeared. Brenda had also seen defendant try to talk to Antoinette at their aunt's house, to which Antoinette responded, "I don't have

shit to say to you. I just want to know where my mother fucking baby's at." Defendant said, "All right," and jumped in his car and sped away. Brenda began to think Antoinette was lying about what she knew, and Brenda and Antoinette argued and did not speak after this. In the evening hours of 12 November, Brenda talked to detectives again, told them about the text messages with defendant, and ultimately gave them her phone to take photos of these texts.

That same day, police found defendant, and he agreed to come to the station to speak with them. Police also located defendant's Mitsubishi Gallant, which was backed into a space at the Mount Sinai apartments, away from his residence on Washington Drive. Police did an exigent circumstances search of the vehicle's trunk and then had the car towed to the police department. The car was processed for forensic evidence, which included taking soil samples from the wheel wells and taking the brake and gas pedal covers for substance analysis.

Beginning at around 9:30 p.m. on the evening of 12 November, several law enforcement officers interviewed defendant in an effort to find Shaniya. Although Shaniya had now been missing for two days, officers were still hopeful of finding her alive. The officers did not handcuff defendant or place him under arrest, and they specifically informed him that the door to the interview room was unlocked and that he was free to leave the room. Defendant also had his cell phone, on which he continued to receive messages and which he used during breaks in the interview. Defendant admitted he was at Sleepy Hollow just after midnight on 10 November

driving around in the black Mitsubishi, but at first he denied going to Brenda Davis's trailer, denied seeing Shaniya or even knowing her, denied having her in the vehicle, and denied leaving the city limits or being in Sanford at a hotel. When police showed defendant a photograph of himself at the hotel, defendant initially denied it was he. When confronted with the information that the same person signed in to the hotel as Mario McNeill showing defendant's identification and listing defendant's home address, defendant suggested that maybe he had lost his identification. Defendant then admitted he had been at the hotel with Shaniya.

About fifty-four minutes into the interview, defendant began telling a story about receiving a text message, which he said he thought came from Brenda Davis's phone, telling him to come to Sleepy Hollow and pick Shaniya up on the porch. Defendant said he got Shaniya and took her to the hotel room, where he ingested cocaine. According to defendant, while he was at the hotel, he got a call or text message from some unknown people to bring Shaniya to a dry cleaning establishment at the corner of Country Club Drive and Ramsey Street. Defendant stated that he delivered Shaniya to these unnamed people and that they were driving a gray Nissan Maxima.

Agent Brostrom testified that the focus of the interview changed when defendant suddenly stated he was waiting to get a call "to come to kill her." The interviewing officers tried to get defendant to expand on this statement, but he would not. The messages on defendant's phone exchanges with Brenda did not pertain to

picking up someone waiting on the porch, as defendant claimed during the interview. There were no calls or text messages to defendant's phone from unknown persons, as claimed by defendant; the only messages during this time period were between defendant's and Brenda's phones. At the end of the interview, defendant was arrested for kidnapping Shaniya.

When police later viewed the videotape of the interview, they saw that when they left defendant alone in the interview room during a break, defendant made the sign of the cross, took out a key, got down on the floor, put the key in a wall electrical socket, and appeared to receive a jolt. Defendant then took off his shoes and put the key in the electrical socket again.

Shaniya had been reported missing on 10 November, and a massive search was continuing along Highway 87 but had not yet located Shaniya. Kimble, the head investigator for the Fayetteville Police Department, later testified in a pretrial hearing that on the morning of 13 November, he met with then-District Attorney Ed Grannis about several cases, including this one. The District Attorney pulled Kimble aside and told Kimble that Allen Rogers, a Fayetteville defense attorney, might have some information that could help them in the case and that Rogers would be calling him. Kimble did not know how Grannis knew Rogers might be able to assist. Rogers had accompanied defendant at his first appearance on Friday morning following his arrest on kidnapping charges, and it was Kimble's understanding that Rogers was defendant's attorney in this matter.

The following day, Kimble received a telephone call from attorney Coy Brewer. Brewer said the information Kimble needed was to look for green porta-potties on Highway 87. Based on the information he received earlier that Allen Rogers would be calling, Kimble assumed after receiving the call from Coy Brewer, that Brewer and Rogers were working together on the case.

Police did look for green porta-potties along Highway 87 and saw numerous porta-potties along the road. Kimble told District Attorney Grannis that the information he had received from Brewer was vague, and Grannis suggested he talk to Rogers. On Sunday, 15 November, Kimble called Allen Rogers and told him that the information he had received from Brewer about looking for green porta-potties along Highway 87 was somewhat vague. Rogers said he was traveling and would talk to his client when he returned to town. Rogers later followed up with Kimble and said police needed "to look for green porta-potties in an area where they kill deer" on Highway 87 between Spring Lake and Sanford. According to Kimble, Rogers stated in a subsequent phone call, "let me talk to my guy" and later called back to say they need to look in an area where hunters field dress deer after they kill them. Kimble called Rogers once more to see if there were additional details, and Rogers said "that's all my guy remembers."[3]

Searchers did not locate Shaniya that day, and the search resumed the

---

[3] Rogers later testified in a pre-trial hearing that he did not recall using the phrase "my guy."

following morning, 16 November 2009. A Sanford company training canine officers from the Virgin Islands volunteered to assist in the search. Around 1:00 p.m. that day, one of the officers from the Virgin Islands and his training dog found Shaniya's body lying partially under a log in an area with deer carcasses near the intersection of Highway 87 and Walker Road. Police collected forensic evidence at the scene. On 19 November 2009, defendant was charged with first-degree murder and first-degree rape of the victim. On 5 July 2011, a Cumberland County Grand Jury indicted defendant for first-degree murder, rape of a child by an adult offender, sexual offense of a child by an adult offender, felony child abuse inflicting serious bodily injury, felony child abuse by prostitution, first-degree kidnapping, human trafficking (minor victim), sexual servitude (minor victim), and taking indecent liberties with a child.[4]

Defendant filed various pre-trial motions, several of which are relevant to his contentions on appeal. Before the indictments, on 9 June 2011, defendant filed a Motion To Prohibit The State from Seeking the Death Penalty Pursuant to the North Carolina Racial Justice Act, and on 5 June 2012, defendant filed a supplement to the motion. A Rule 24 conference was held on 5 October 2011, during which the State gave notice of its intent to seek the death penalty. Defendant did not raise his claim under the Racial Justice Act at the Rule 24 conference. The trial court conducted a

---

[4] On 25 July 2011, the grand jury returned superseding indictments for all the charges. On 11 February 2013, the grand jury again returned superseding indictments for first-degree kidnapping, human trafficking (minor victim), and sexual servitude (minor victim).

hearing on numerous pre-trial motions on 11 January 2013, at which time the trial court denied defendant's motions under the Racial Justice Act.

On 9 January 2013, defendant filed a motion to suppress all statements he made to law enforcement officers during his interview on 12 November 2009. The motion was heard on 2 April 2013, and on 4 April 2013, the trial court signed an order denying the motion in part and granting it in part, in which the court suppressed defendant's statements made during a one-minute period near the end of the interview, when Brostrom "answered the Defendant's question by telling the Defendant that he had been free to leave until he had confessed to kidnapping" but had not yet advised defendant of his *Miranda* rights.

The next day, 5 April, defendant filed a document captioned in part a Motion to Require Specific Performance or, Alternatively, to Suppress Statements and Evidence.[5] The motion alleged that, in exchange for information regarding the location of Shaniya's body as conveyed through defendant's initial attorneys, Allen Rogers and Coy Brewer, the State had agreed not to seek the death penalty. Defendant sought "specific performance" of the purported agreement, suggesting that the trial court should declare the case noncapital or, in the alternative, suppress the

---

[5] The full title of defendant's motion was "MOTION TO REQUIRE SPECIFIC PERFORMANCE BY THE STATE OF ITS PROMISE TO DEFENDANT; OR, IN THE ALTERNATIVE, MOTION TO SUPPRESS STATEMENTS OF DEFENDANT THAT LED TO DISCOVERY OF BODY, ALONG WITH SUPPRESSION OF ANY AND ALL EVIDENCE DERIVED FROM THE DISCOVERY OF THE BODY."

evidence that defendant's attorneys had disclosed the location of Shaniya's body as well as all evidence obtained from discovery of the body because defendant had received ineffective assistance of counsel. At the hearing on the motion on 8 April 2013, defendant presented documentary evidence, but offered no testimony. The trial court orally denied defendant's motion at the hearing and entered its written order on 17 April 2013. The trial court found that no agreements existed between the State of North Carolina and defendant in exchange for his information regarding the location of Shaniya and that his attorneys were authorized by him to provide the information to law enforcement. Further, the trial court ruled that the disclosure did not occur at a " 'critical stage' of the proceeding," but that even if such had been the case, defendant did not receive ineffective assistance of counsel.

Additionally, when the trial court became aware at the 8 April hearing that the State was offering defendant a plea of guilty to first-degree murder with a sentence of life imprisonment without parole in lieu of a possible death sentence, the trial court inquired of defendant's counsel if defendant and they were aware of the offer and whether they needed additional time to consider it. Defendant's counsel informed the trial court that defendant had elected to proceed to trial. The trial court required the State to hold the offer open for at least one more day to give defendant and his counsel more time to consider the offer. On 9 April 2013, defendant, through his counsel, rejected the State's offer of life imprisonment and elected to proceed to trial.

Also on 5 April 2013, the State filed a motion *in limine* asking the court to determine the admissibility, under Rule of Evidence 801(d), of statements made by defendant through his counsel to law enforcement concerning the location of the body of Shaniya Davis. When this motion came on for hearing on 26 and 29 April 2013, defendant made oral motions arguing, *inter alia*, that evidence regarding the disclosure of Shaniya's location was inadmissible on grounds of: (1) ineffective assistance of counsel; (2) attorney-client privilege, the Sixth Amendment to the United State Constitution, and Article I, Section 23 of the North Carolina Constitution; (3) N.C.G.S. § 8C-1, Rule 801(d); and (4) the Due Process and Law of the Land Clauses of the Federal and North Carolina constitutions. The trial court heard testimony from Kimble, Rogers, and Brewer;[6] defendant again did not testify at this hearing. The trial court entered a written order, which included findings and conclusions and also adopted and incorporated by reference the findings and conclusions set forth in its 17 April 2013 order, concluding that defendant's right to effective assistance of counsel had not been violated and that the attorneys'

---

[6] Brewer asserted the attorney-client privilege as to all questions asked, including whether he represented defendant. After Brewer's testimony the trial court noted that for the privilege to exist, the relationship of attorney and client had to be shown, and defendant had not even established this fact. Defendant then called attorney Allen Rogers, who in similar vein asserted the attorney-client privilege as to each question asked. The trial court noted that Rogers's client was present; the State noted that defendant was asserting ineffective assistance of counsel in the alternative and thus had waived the privilege as to this subject. The trial court ruled defendant had waived the privilege as to the things alleged and ordered Rogers to answer the questions.

statements to law enforcement regarding Shaniya's location were admissible through Captain Kimble as an exception to the hearsay rule under N.C.G.S. § 8C-1, Rule 801(d) ("Exception for Admissions by a Party-Opponent").

Defendant was tried before Judge James Floyd Ammons Jr. at the 8 April 2013 criminal session of the Superior Court in Cumberland County. Before trial, the State dismissed the two charges of felony child abuse. At trial, defendant stipulated to four items: (1) that he was at Sleepy Hollow; (2) that he left the trailer park with Shaniya Davis; (3) that he was at the Comfort Suites with Shaniya Davis; and (4) that he left the Comfort Suites with Shaniya Davis. In addition to the evidence previously discussed, the State presented considerable forensic evidence at trial.

Thomas Clark, M.D., Deputy Chief Medical Examiner for the State of North Carolina until his retirement in 2010, conducted the autopsy on Shaniya Davis on 17 November 2009 and testified at trial as an expert in the field of forensic pathology. The autopsy identified a small bruise on the left side of Shaniya's face, injuries to her vaginal area, and two abrasions on her upper thighs. Dr. Clark testified that abrasions are a scraping type of injury in which part or all of the outer layer of skin is removed by a blunt object, and that two linear or line-like abrasions at the upper part of Shaniya's inner thighs matched the band of the underwear Shaniya was wearing. Dr. Clark noted injuries consistent with sexual assault, specifically, the absence of a hymen and the presence of a ring of abrasion or scraping injury surrounding the entrance to the vagina indicating that a blunt object had penetrated

the vagina and left the ring of injury. In addition to preparing a sexual assault kit, Dr. Clark collected several hairs that were found during the external examination and preserved the sheet on which Shaniya was initially examined. Shaniya's lungs showed edema, chronic bronchitis, and focal intra-alveolar hemorrhage. Edema is caused by an imbalance of pressure in the body that causes fluid from capillaries to enter the air spaces in the lung. Dr. Clark concluded that the most likely cause of death was external airway obstruction or asphyxiation.

Special Agent Jody West, a supervisor in the forensic biology section of the State Crime Lab, testified as an expert in the field of forensic serology and forensic DNA analysis. Special Agent West examined the evidence in this case, including performing a Kastle-Meyer or phenolphthalein test, which is a test used to indicate whether blood is present on an item. This chemical analysis indicated the presence of blood on the vaginal swabs, rectal swabs, oral swabs, and the crotch area of Shaniya's panties. Samples from the small blanket recovered from the trash can gave the chemical indication for blood, as did the inside bottom rear portion of the shirt Shaniya was wearing. The white sheet from the medical examiner's office also gave a chemical indication for the presence of blood. Examination of the items failed to produce a chemical indication for the presence of semen, spermatazoa, or human saliva.

DNA analysis on samples taken from the rear seat of defendant's car was consistent with multiple contributors; defendant could not be excluded as a

contributor, and no conclusion could be rendered regarding the contribution of Shaniya Davis to this mixture. Special Agent West transferred some items to Jennifer Remy of the trace evidence section at the Crime Lab for DNA hair analysis and to Kristin Hughes of the forensic biology section to perform Y-STR analysis—a type of DNA analysis focusing on the Y chromosome. Analysis of hairs collected in the case ultimately revealed a pubic hair having the same mitochondrial DNA as defendant's pubic hair found on the hotel comforter, and another pubic hair with the same mitochondrial DNA as defendant's pubic hair found on the small blanket found in the trash can of the mobile home park. Defendant could not be excluded as the source of these two hairs. Two head hairs found on the small blanket located in the trash can of the mobile home park had the same mitochondrial DNA sequence as Shaniya Davis's head hair; therefore, Shaniya could not be excluded as the source of those hairs. Three hairs recovered from Shaniya's right hand by the medical examiner were consistent with Shaniya's own head hair and were not sent for further testing. The Y-STR analysis on the vaginal swabs, the rectal swabs, and the oral swabs revealed no male DNA; Special Agent Hughes testified that this result was not unexpected because DNA begins to degrade or break down over time and that beyond a seventy-two hour window, it becomes more and more likely that investigators will not be able to obtain any DNA profile.

Heather Hanna, a geologist with the North Carolina Geological Survey, testified as an expert in forensic geochemistry and forensic geology. Hanna analyzed

soil samples, including those from the roadside near where the body was found, from the body recovery site, and from the gas pedal of defendant's Mitsubishi Gallant. In all three samples she found garnet, a mineral grain that was unique to two geologic units upstream from near where the body was discovered and which would not naturally be found in Fayetteville. Hanna concluded that it was "highly unlikely" that the soil from those three samples did not come from the same source.

Hanna also found a tiny metal fiber in the soil sample taken from the shoulder of the road near the body recovery site and another metal fiber in the soil collected from the gas pedal of defendant's car. These samples were analyzed by Roberto Garcia, an expert in materials characterization and identification who is a materials engineer at N.C. State University in the analytical instrumentation facility. Garcia testified that the measurements of the two pieces of metal were consistent with each other and that their thickness and shape suggested they came from a braided metal wire. Further, a chemical analysis using an energy dispersive spectroscopy (an EDS detector) indicated that the two samples also were chemically consistent. Garcia's conclusion was that the metallic fiber from the gas pedal of defendant's car and the metallic fiber from the soil sample from the body recovery site were consistent with each other and consistent with having the same source.

Following Special Agent Sutton's initial analysis of defendant's cell phone activity, which led to his recommendation to law enforcement to search in the Highway 87 area along Highway 27, he later conducted a more extensive analysis of

defendant's cell phone. Based on defendant's cell phone records, Sutton testified where defendant's phone had been at certain times on 10 November 2009: at approximately 2:33 a.m., it was in the area of Fayetteville at and around defendant's residence on Washington Drive; at approximately 2:59 a.m., 3:02 a.m., 3:05 a.m., 3:19 a.m., and 3:57 a.m., it was in the area of and around Shaniya's residence at Sleepy Hollow; at approximately 7:00 a.m., 7:32 a.m., and 7:45 a.m., it was in the Sanford area at or near the Comfort Suites; at approximately 8:22 a.m. and 8:25 a.m., it was south of Walker Road near the intersection of Highway 87, Highway 24, and Highway 27, in an area that is between the Johnsonville and Barbecue area on Highway 87 and is the area in which Shaniya's body was eventually discovered; and during a remaining block of calls beginning at approximately 9:38 a.m., the phone was back in the area of defendant's residence.

Defendant did not present any evidence during the guilt-innocence proceeding of the trial.

On 23 May 2013, a jury found defendant guilty of first-degree murder based on malice, premeditation, and deliberation, and under the felony murder rule, with the underlying felonies being sex offense of a child and kidnapping. The jury also found defendant guilty of all other remaining charges, except for rape of a child by an adult offender.

The trial court then held a capital sentencing proceeding, during which the State introduced evidence that defendant had been convicted on 10 January 2003 of

three counts of assault inflicting serious bodily injury. Defendant stipulated that this information was correct.

Shaniya's father and half-sister testified as impact witnesses. Shaniya's father, Bradley Lockhart, testified that he had met Shaniya's mother at a party, had been in a brief relationship with her, and had learned that Antoinette was pregnant only shortly before Shaniya's birth on 14 June 2004. For a little less than two years after Shaniya's birth, Shaniya lived with Antoinette and her family. Mr. Lockhart had frequent contact with Shaniya and would pick her up every weekend for visits.

Toward the end of 2006 or the beginning of 2007, Mr. Lockhart bought a fairly large house in Fayetteville, and Shaniya moved in with him and his four other children. Shaniya had frequent contact with her mother during this time. Shaniya was very close with Mr. Lockhart and the other children; she enjoyed dress-up and prancing around the house in her plastic dress-up shoes but was also a little bit of a tomboy and liked to play basketball with her little brother and ride her little scooter. Shaniya considered herself a singer and desired to join the children's choir at the church they attended.

Shaniya moved back to be with her mother in October 2009. Even when he was out of town for work, Mr. Lockhart talked to Shaniya on the telephone four to five times a week. Mr. Lockhart testified that Shaniya's death was one of the hardest things he had experienced, that it tears him up every day, and that he still finds it hard to sleep even after three-and-a-half years. He said he suffered two collapsed

lungs from the stress, finds it hard to stay focused and to function, and questions if he could have done anything different.

Cheyenne Lockhart, Bradley Lockhart's twenty-one-year-old daughter and Shaniya's half-sister, described Shaniya as her little "mini-me" who followed her everywhere. Shaniya was bubbly and loved to talk and play jokes. She was caring and would always tell them she loved them. Shaniya's loss was very painful, and Cheyenne thinks about Shaniya every day.

Defendant did not present additional mitigation evidence or give closing arguments in the sentencing proceeding; he understood that this decision was against the advice of counsel. The trial court determined that there was an absolute impasse between defendant and his attorneys and ordered the attorneys to acquiesce to defendant's wishes.

On 29 May 2013, the jury returned a binding recommendation that defendant be sentenced to death for the first-degree murder. The trial court accordingly sentenced Mr. McNeill to death for first-degree murder, and to consecutive sentences of 336 to 413 months for sexual offense against a child by an adult offender, 116 to 149 months for first-degree kidnapping, 116 to 149 months for human trafficking of a minor victim, 116 to 149 months for sexual servitude of a minor victim, and 21 to 26 months for taking indecent liberties with a child. Defendant immediately filed his appeal of right to this Court.

<u>Analysis</u>

Ineffective Assistance of Counsel

Defendant first argues that he received ineffective assistance of counsel from his original attorneys because they disclosed to law enforcement where to look for Shaniya. Defendant contends that even though he was asserting his innocence, his attorneys, Rogers and Brewer, made this disclosure only one day into their representation, without seeking any benefit or protection in return, without any deal in place, without receiving or consulting any formal discovery from the State, and after giving defendant erroneous advice.

As an initial matter, we have held that ineffective assistance of counsel claims brought on direct review, as opposed to in a motion for appropriate relief, "will be decided on the merits when the cold record reveals that no further investigation is required, i.e., claims that may be developed and argued without such ancillary procedures as the appointment of investigators or an evidentiary hearing." *State v. Fair*, 354 N.C. 131, 166, 557 S.E.2d 500, 524 (2001) (citations omitted), *cert. denied*, 535 U.S. 1114, 122 S. Ct. 2332, 153 L. Ed. 2d 162 (2002). Defendants "should necessarily raise those [ineffective assistance of counsel] claims on direct appeal that are apparent from the record" and are "not required to file a separate [motion for appropriate relief] in the appellate court during the pendency of that appeal." *Id.* at 167, 557 S.E.2d at 525. Accordingly, "on direct appeal we must determine if . . . ineffective assistance of counsel claims have been prematurely brought," in which event "we must 'dismiss those claims without prejudice to the defendant's right to

reassert them during a subsequent [motion for appropriate relief] proceeding.'" *State v. Campbell*, 359 N.C. 644, 691, 617 S.E.2d 1, 30 (2005) (second alteration in original) (quoting *Fair*, 354 N.C. at 167, 557 S.E.2d at 525), *cert. denied*, 547 U.S. 1073, 126 S. Ct. 1773, 164 L. Ed. 2d 523 (2006).

Here defendant first raised his ineffective assistance of counsel argument before trial in his Motion to Require Specific Performance or, Alternatively, to Suppress Statements and Evidence. Thus, defendant was able to present evidence and arguments during a hearing on that motion, which the trial court took into consideration in its 17 April 2013 order denying defendant's motion and ruling that defendant did not receive ineffective assistance of counsel. Additionally, in its subsequent ruling on the State's motion *in limine* and defendant's oral motions relating to the admissibility of evidence about the disclosure, the trial court considered further arguments and evidence, including the testimony of Captain Kimble, as well as that of defendant's original attorneys, Rogers and Brewer. Defendant reasserted his ineffective assistance of counsel argument at this hearing. In an order entered on 16 May 2013, the trial court again ruled that defendant's attorneys were not ineffective. Because the trial court was able to receive evidence and make findings on this issue before trial, we conclude that "the cold record reveals that no further investigation is required." *Fair*, 354 N.C. at 166, 557 S.E.2d at 524. Accordingly, we may properly address the merits of defendant's ineffective assistance of counsel claim.

"The right to assistance of counsel is guaranteed by the Sixth Amendment to the Federal Constitution and by Article I, Sections 19 and 23 of the Constitution of North Carolina." *State v. Sneed*, 284 N.C. 606, 611, 201 S.E.2d 867, 871 (1974). A defendant's right to assistance of counsel "includes the right to the effective assistance of counsel." *State v. Braswell*, 312 N.C. 553, 561, 324 S.E.2d 241, 247-48 (1985) (citing *McMann v. Richardson,* 397 U.S. 759, 771 & n.14, 90 S. Ct. 1441, 1449 & n.14, 25 L. Ed. 2d 763, 773 & n.14 (1970)).[7] A defendant challenging his conviction on the basis of ineffective assistance of counsel must establish that his counsel's conduct "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 687-88, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674, 693 (1984). In *Strickland* the United States Supreme Court set out a two-part test that a defendant must satisfy in order to meet his burden:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is

---

[7] The State argues, and the trial court found in its 17 April 2013 order, that because the Sixth Amendment is offense specific, and because defendant had at the time of the disclosure only been charged with kidnapping, defendant's Sixth Amendment right to counsel had not attached for purposes of the subsequent first-degree murder charge. Therefore, the State argues that the trial court correctly found that defendant could not have had an ineffective assistance of counsel claim under the Sixth Amendment. Because we conclude that defendant did not receive ineffective assistance of counsel, we need not address whether defendant's Sixth Amendment right to counsel had attached with respect to the first-degree murder charge at the time of the disclosure.

> reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687, 104 S. Ct. at 2064, 80 L. Ed. 2d at 693; *see also Braswell*, 312 N.C. at 562-63, 324 S.E.2d at 248 ("[W]e expressly adopt the test set out in *Strickland v. Washington* as a uniform standard to be applied to measure ineffective assistance of counsel under the North Carolina Constitution.").

With regard to the first *Strickland* prong, "[r]ather than articulating specific guidelines for appropriate attorney conduct, the Court in *Strickland* emphasized that '[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms.' " *State v. Todd*, 369 N.C. 707, 711, 799 S.E.2d 834, 837-38 (2017) (second alteration in original) (quoting *Strickland* 466 U.S. at 688, 104 S. Ct. at 2065, 80 L. Ed. 2d at 694). We have stated that "[c]ounsel is given wide latitude in matters of strategy, and the burden to show that counsel's performance fell short of the required standard is a heavy one for defendant to bear." *State v. Fletcher*, 354 N.C. 455, 482, 555 S.E.2d 534, 551 (2001), *cert. denied*, 537 U.S. 846, 123 S. Ct. 184, 154 L. Ed. 2d 73 (2002); *see also Strickland*, 466 U.S. at 690-91, 104 S. Ct. at 2066, 80 L. Ed. 2d at 695 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support

the limitations on investigation."). "Moreover, this Court indulges the presumption that trial counsel's representation is within the boundaries of acceptable professional conduct." *Campbell*, 359 N.C. at 690, 617 S.E.2d at 30 (citing *State v. Fisher*, 318 N.C. 512, 532, 350 S.E.2d 334, 346 (1986)). As the Court stated in *Strickland*:

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . .

466 U.S. at 689, 104 S. Ct. at 2065, 80 L. Ed. 2d at 694.

With regard to the second *Strickland* prong, "[p]rejudice is established by showing 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Campbell*, 359 N.C. at 690, 617 S.E.2d at 29 (quoting *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068, 80 L. Ed. 2d at 698). "The fact that counsel made an error, even an unreasonable error, does not warrant reversal of a conviction unless there is a reasonable probability that, but for counsel's errors, there would have been a different result in the proceedings." *Braswell*, 312 N.C. at 563, 324 S.E.2d at 248 (citing *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068, 80 L. Ed. 2d at 698). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Campbell*, 359 N.C. at 690, 617 S.E.2d at 29-30 (quoting *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068, 80 L. Ed. 2d

at 698). "[B]oth deficient performance and prejudice are required for a successful ineffective assistance of counsel claim." *Todd*, 369 N.C. at 711, 799 S.E.2d at 837.

When the trial court has made findings of fact and conclusions of law to support its ruling on a defendant's claim of ineffective assistance of counsel, "we review the trial court's order to determine 'whether the findings of fact are supported by evidence, whether the findings of fact support the conclusions of law, and whether the conclusions of law support the order entered by the trial court.'" *State v. Frogge*, 359 N.C. 228, 240, 607 S.E.2d 627, 634 (2005) (quoting *State v. Stevens*, 305 N.C. 712, 720, 291 S.E.2d 585, 591 (1982)).[8] We review conclusions of law de novo. *E.g.*, *State v. Biber*, 365 N.C. 162, 168, 712 S.E.2d 874, 878 (2011) (citing *State v. McCollum*, 334 N.C. 208, 237, 433 S.E.2d 144, 160 (1993), *cert. denied*, 512 U.S. 1254, 114 S. Ct. 2784, 129 L.E.2d 895 (1994), *judgment vacated*, Nos. 83 CRS 15506-07 (Robeson Co.), 91 CRS 40727 (Cumberland Co.), 2014 WL 4345428 (N.C. Super Ct. Robeson County Sept. 2, 2014)).

Defendant's claim stems from the conduct of his original attorneys, Rogers and Brewer. After defendant was charged with kidnapping, he waived court appointed counsel and engaged the services of Rogers, who had previously represented

---

[8] While in *Frogge* the trial court's order addressed a claim of ineffective assistance of counsel brought in a postconviction motion for appropriate relief, 359 N.C. at 230, 607 S.E.2d at 628-29, we can find no reason to apply a different standard in reviewing a trial court's ruling on a claim of ineffective assistance of counsel brought before trial and challenged on direct appeal.

defendant in 2003 and 2008. Rogers is a former JAG attorney who at that time had practiced law for twenty years, and a large part of his practice was criminal defense work. Rogers immediately associated Brewer, with whom he had a working relationship in criminal cases, to assist in the matter. Brewer is a former assistant district attorney and former district court judge. Additionally, Brewer was a superior court judge for the 12th Judicial District from 1977 until 1998, and he was the senior resident superior court judge for the 12th Judicial District from 1991 to 1998. Brewer had returned to practicing law, and since 1999 a large part of his practice was criminal defense. The trial court made findings that Rogers and Brewer were both experienced criminal defense attorneys.

When Rogers and Brewer undertook representation of defendant on 13 November 2009, Shaniya had been missing since the morning of 10 November. A massive search had been underway since the morning of Shaniya's disappearance, and law enforcement officers, having seen a child resembling Shaniya in the hotel videos, hoped to find her still alive. Defendant had admitted to police that he had taken Shaniya from Sleepy Hollow to the Comfort Suites in Sanford, where he had been observed by hotel cameras and multiple witnesses and was the last person to be seen with Shaniya. By 12 November, multiple law enforcement agencies and volunteers were searching in the area around Highway 87 near Sanford, where defendant's cell phone data had placed him.

Rogers had conversations with Kimble to gauge the status of the investigation, and he was aware of the evidence against defendant and defendant's admission to taking Shaniya from Sleepy Hollow to the Comfort Suites. Rogers testified that he was also aware of defendant's three felony convictions for assault in 2003, which constituted aggravating circumstances that could be used at a capital sentencing proceeding. Accordingly, when Rogers and Brewer met with defendant, "there was conversation about the search and about the consequences of the child not being found," and they began discussing with defendant the possibility that forthcoming charges could result in a capital case. Defendant "was denying that he was involved in hurting [Shaniya] or killing her," and Rogers asked defendant "if he had any information about the location of [Shaniya]." Defendant told Rogers and Brewer he did have information about Shaniya's location, but according to Rogers, "[defendant] didn't tell me where he got the information from." When Rogers was asked at the hearing whether there was a presumption that Shaniya was alive, he stated:

> Again, didn't know -- really didn't know. As I said, [defendant] denied, you know, causing her harm, assaulting her in any way. There certainly was some concerns with the amount of time, but I can't say that we knew.

Rogers testified that it was in this "atmosphere"—with a five-year-old child missing over several cold and rainy days, with law enforcement performing a massive search, and with defendant being the sole suspect and the last person to be seen with Shaniya—that this conversation came about.

According to Rogers, they discussed the death penalty with defendant, and defendant "agreed that it would be in his best interests to offer information that might be helpful to the location." Rogers explained to defendant that providing this information could be helpful because such action could show cooperation and remorse, which could either help achieve a plea agreement for a life sentence or be presented as mitigating circumstances in a sentencing proceeding, and ultimately "could avert the imposition of the -- and execution of the death penalty." Accordingly, defendant agreed with Rogers and Brewer that they would recommend where to search to law enforcement without specifically stating defendant's name or that he was the source of the information. According to Rogers, he was trying to give defendant the best advice he could to help save defendant's life, and defendant understood the situation at that point and agreed with the strategy.

Accordingly, Brewer spoke with Captain Kimble on 14 November 2009 and instructed him to "look for green porta-potties on Highway 87." Rogers then spoke with Kimble on 14 and 15 November and told him to "look for green porta-potties in an area where they kill deer . . . . on Highway 87 between Spring Lake and Sanford," and also to "look in an area where they -- where they take the deer after they -- after they've been killed." Captain Kimble narrowed the search, and at approximately 1:00 p.m. on 16 November 2009, one of the searchers found Shaniya's body in the woods "near the area where they were field dressing deer."

Defendant first raised his pretrial ineffective assistance of counsel argument in his 5 April 2013 Motion to Require Specific Performance or, Alternatively, to Suppress Statements and Evidence. In its 17 April 2013 order denying defendant's motion, the trial court found as fact:

> 2. The Court provided the Defendant the opportunity to present evidence and arguments during the hearing on his Motion, and the Defendant did so.
>
> 3. The Defendant offered into evidence without objection four (4) exhibits, Defendant's Exhibits A, B, C, and D.[9] The Court carefully examined the Defendant's exhibits.
>
> 4. When the Court provided the Defendant an opportunity to present sworn testimony, the Defendant did not do so.
>
> . . . .
>
> 6. During Mr. Rogers' representation, the Defendant provided specific information to Mr. Rogers as to the location of Shaniya Davis' body, and the Defendant

---

[9] Exhibit A was an e-mail apparently from Agent Brostrom in which he stated:

> I think we should monitor the possibility, at the appropriate time, to approach the attorneys for the kidnaper/rapist Mario McNeill and for the mother Antoinette Davis, regarding potential cooperation agreements in order to get the whole story. To date, I [sic] the DA has offered to take the Death Penalty off the table in exchange for the body.

The trial court found that "[n]either the District Attorney nor anyone acting on his behalf" made such an offer and that there existed "no agreement of any kind as to what would happen if the Defendant provided law enforcement with information concerning the location" of Shaniya. Defendant does not challenge the trial court's findings regarding the existence of any agreement, but instead directs his arguments towards his attorneys' purported failure to pursue such an agreement.

authorized Mr. Rogers to provide that specific information to law enforcement.

7.      Pursuant to the Defendant's authorization, Mr. Rogers provided to law enforcement that specific information as to the location of Shaniya Davis' body.

8.      The Defendant's information regarding the location of Shaniya Davis' body did not constitute an admission to a crime.

        . . . .

13.     Under the totality of the circumstances, Mr. Rogers did not ineffectively assist the Defendant in providing information to law enforcement concerning the location of Shaniya Davis' body without an agreement of some kind as to what would happen should the Defendant provide that information.

14.     The Defendant's provision of such information to law enforcement through his attorney at that stage in the search for Shaniya Davis was objectively reasonable in that it provided the State a basis for it to consider future plea negotiations with the Defendant should the Defendant be charged with more offenses related to the missing child during which negotiations the death penalty might be eliminated from the range of possible punishments. The provision of such information was also objectively reasonable in that it provided the Defendant the opportunity to obtain the benefit of a mitigating circumstance should charges be brought against the Defendant for which the death penalty was a possible punishment.

        . . . .

17.     The Defendant was represented by competent

counsel who afforded him effective, reasonable, and professional representation.

From these findings, the trial court made the following conclusions, in relevant part:

3.    . . . [E]ven if the exchange of information at issue in this matter occurred at a "critical stage" of the proceeding, the Defendant has not shown that his counsel's performance fell below an objective standard of reasonableness.

4.    Likewise, even if the exchange of information at issue in this matter occurred at a "critical stage" of the proceeding, the Defendant has not shown that the alleged deficient performance prejudiced the defense in such a way as will deprive the defendant of a fair trial.

5.    The Defendant was represented by competent counsel who afforded him effective, reasonable, and professional representation.

6.    None of the Defendant's rights under the United States Constitution, North Carolina Constitution, or the North Carolina General Statutes were violated.

Additionally, in its subsequent ruling on the State's motion *in limine* and defendant's oral motions regarding the admissibility of evidence relating to the disclosure, the trial court considered further arguments and evidence, including the testimony of Captain Kimble, as well as that of defendant's original attorneys, Rogers and Brewer. At this hearing, defendant reasserted his ineffective assistance of counsel argument; however, he did not testify at the hearing. In an order entered on 16 May 2013, the trial court made the following relevant findings:

5.    During their representation of the Defendant, Mr.

Brewer and Mr. Rogers talked to the Defendant while he was in jail about cooperating with the police in looking for Shaniya Davis. They discussed how the Defendant might benefit from cooperating with the police on this issue by avoiding the imposition and execution of the death penalty. During these discussions, the Defendant specifically authorized his attorneys, Brewer and Mr. Rogers, to give information to the police relating to the location of Shaniya Davis. Nothing about their discussions suggests that the Defendant involuntarily provided the information at issue to his attorneys.

. . . .

9. The Defendant authorized his attorneys to communicate information to the police that would aid them in locating Shaniya Davis. The Defendant did not authorize his attorneys to make any admissions on his behalf, and they did not make any admissions on his behalf. Neither Mr. Rogers nor Mr. Brewer told Captain Kimble the specific source of the information as to the directions where to search. As this Court has previously found and concluded in its prior Order relating to the Defendant's Motion for Specific Performance, the State of North Carolina, through the District Attorney's office, never offered any deal, plea concessions, immunity, or any other incentives to the Defendant for this information, and neither Mr. Brewer nor Mr. Rogers ever communicated any deal, plea concessions, or any other incentives from the State to the Defendant.

. . . .

17. Under the totality of the circumstances, the Defendant's attorneys did not ineffectively assist the Defendant in providing information to law enforcement concerning the location of Shaniya Davis' body without an agreement of some kind as to

what would happen should the Defendant provide that information.

18. The Defendant's provision of such information to law enforcement through his attorney at that stage in the search for Shaniya Davis was objectively reasonable in that it provided the State a basis for it to consider future plea negotiations with the Defendant should the Defendant be charged with more offenses related to the missing child during which negotiations the death penalty might be eliminated from the range of possible punishments. The provision of such information was also objectively reasonable in that it provided the Defendant the opportunity to obtain the benefit of a mitigating circumstance should charges be brought against the Defendant for which the death penalty was a possible punishment.

19. The Defendant was represented by competent counsel who afforded him effective, reasonable, and professional representation.

20. In keeping with this Court's prior Order on the Defendant's claim of ineffective assistance of counsel, the Court adopts and incorporates by reference all of its findings of fact and conclusions of law in this Order as if fully set forth herein. In so doing, the Court again does not find or conclude that any ineffective assistance of counsel has occurred. The Defendant has not shown that the advice and conduct of his attorneys fell below an objective standard, and the Defendant has not shown any prejudice. Even if the Defendant is prejudiced by the disclosure of this information, he has also benefited by the disclosure of this information in that the State offered to allow the Defendant to plead guilty and avoid the death penalty. He received that benefit. Further assuming that the Defendant could show prejudice, the Court does not find ineffective assistance of counsel. This finding is without

prejudice to the Defendant and may be raised on appeal.

21. Furthermore, the Court finds that the Defendant's attorneys were not ineffective in their representation of the Defendant as the Defendant made a voluntary strategic decision to provide the information at issue so as to obtain the benefit of avoiding the imposition and execution of the death penalty. The Defendant may also receive a future benefit of this disclosure if he is convicted of first degree murder and thereby faces a sentencing hearing in that the disclosure of the information as to the location of Shaniya Davis may be offered as a mitigating circumstance to the jury.

From these findings, the trial court made the following conclusions, in relevant part:

7. Under the totality of the circumstances, the Defendant's attorneys did not ineffectively assist the Defendant in providing information to law enforcement concerning the location of Shaniya Davis' body without an agreement of some kind as to what would happen should the Defendant provide that information.

8. The Defendant's provision of such information to law enforcement through his attorney at that stage in the search for Shaniya Davis was objectively reasonable in that it provided the State a basis for it to consider future plea negotiations with the Defendant should the Defendant be charged with more offenses related to the missing child during which negotiations the death penalty might be eliminated from the range of possible punishments. The provision of such information was also objectively reasonable in that it provided the Defendant the opportunity to obtain the benefit of a mitigating circumstance should charges he brought

against the Defendant for which the death penalty was a possible punishment.

9.    The Defendant was represented by competent counsel who afforded him effective, reasonable, and professional representation.

10.   In keeping with this Court's prior Order on the Defendant's claim of ineffective assistance of counsel, the Court adopts and incorporates by reference all of its findings of fact and conclusions of law in this Order as if fully set forth herein.

11.   The Defendant has not shown that the advice and conduct of his attorneys fell below an objective standard, and the Defendant has not shown any prejudice. Even if the Defendant is prejudiced by the disclosure of this information, he has also benefited by the disclosure of this information in that the State offered to allow the Defendant to plead guilty and avoid the death penalty. He received that benefit. Further assuming that the Defendant could show prejudice, there was no ineffective assistance of counsel.

12.   Furthermore, the Defendant's attorneys were not ineffective in their representation of the Defendant as the Defendant made a voluntary strategic decision to provide the information at issue so as to obtain the benefit of avoiding the imposition and execution of the death penalty. The Defendant may also receive a future benefit of this disclosure if he is convicted of first degree murder and thereby faces a sentencing hearing in that the disclosure of the information as to the location of Shaniya Davis may he offered as a mitigating circumstance to the jury.

      . . . .

14.   None of the Defendant's rights under the United States Constitution, North Carolina Constitution, or

the North Carolina General Statutes were violated.

Here defendant does not challenge any of the trial court's findings of fact, but rather, he disputes the trial court's ultimate determination that he did not receive constitutionally deficient counsel under *Strickland*.

### A. Benefit of Disclosure

Defendant initially attempts to meet his burden under the first *Strickland* prong by arguing that his attorneys' conduct was deficient because they "handed the State the single most incriminating piece of evidence against [defendant] without even seeking any benefit or protection for [defendant] in return." Defendant points out that Rogers testified that he never tried to get any type of agreement from the State before disclosing the information. Defendant asserts that under the "[p]revailing norms of practice," *Strickland*, 466 U.S. at 688, 104 S. Ct. at 2065, 80 L. Ed. 2d at 694, his attorneys had a duty to seek or secure a benefit for him in exchange for the disclosure, and that their breach of this duty was constitutionally deficient. We disagree.

In making this argument, defendant relies upon the American Bar Association (ABA) Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, as they were applicable at the time. *See id.* at 688, 104 S. Ct. at 2065, 80 L. Ed. 2d at 694 ("Prevailing norms of practice as reflected in American Bar Association standards and the like, *e. g.*, ABA Standards for Criminal Justice 4–1.1 to 4–8.6 (2d

ed. 1980) ("The Defense Function"), are guides to determining what is reasonable, but

they are only guides."). Specifically, Guideline 10.5.B.2 provided:

> Promptly upon entry into the case, initial counsel should communicate in an appropriate manner with both the client and the government regarding the protection of the client's rights against self-incrimination, to the effective assistance of counsel, and to preservation of the attorney-client privilege and similar safeguards.

Additionally, Guideline 10.9.1 provided, in relevant part:

> A.   Counsel at every stage of the case have an obligation to take all steps that may be appropriate in the exercise of professional judgment in accordance with these Guidelines to achieve an agreed-upon disposition.

> B.   Counsel at every stage of the case should explore with the client the possibility and desirability of reaching an agreed-upon disposition. In so doing, counsel should fully explain the rights that would be waived, the possible collateral consequences, and the legal, factual, and contextual considerations that bear upon the decision.

Defendant also relies upon the ABA Standards for Criminal Justice, Prosecution

Function and Defense Function applicable at that time. Specifically, Standard 4-3.6,

entitled "Prompt Action to Protect the Accused," provided, *inter alia*:

> Many important rights of the accused can be protected and preserved only by prompt legal action. Defense counsel should inform the accused of his or her rights at the earliest opportunity and take all necessary action to vindicate such rights.

While these provisions, which undoubtedly furnish sound guidance to defense

attorneys in criminal cases, are perhaps broader in scope than the specific duty

contemplated by defendant here, they do in general terms tend to support defendant's assertion that defense counsel should protect their client's rights by pursuing benefits in return for the disclosure of potentially incriminating information.

Yet, to the extent that counsel has a duty to *seek* a benefit in exchange for disclosing such information, it is plain that defendant's attorneys did seek a benefit in exchange for the disclosure of Shaniya's location—the purpose of the disclosure was to show that defendant could demonstrate cooperation and remorse, which would benefit defendant in the form of achieving a plea agreement for a life sentence or as a mitigating circumstance, and ultimately, to avoid the imposition of the death penalty. This was the "agreed-upon disposition," ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 10.9.1 (Feb. 2003), which defendant later repudiated when he rejected the State's plea offer of life in prison and refused to present mitigating evidence at trial.

Despite defendant's assent at the time of the disclosure, he argues on appeal that a plea agreement for life in prison so as to avoid the death penalty was not a reasonable objective that would justify the disclosure of incriminating information at that stage of the case because his attorneys were aware he had denied causing Shaniya any harm and because, according to defendant, "everything turned" on his innocence defense. This contention, however, is difficult to square with the record, because his attorneys were also aware that he had in essence confessed to kidnapping a five-year-old child from her home in the middle of the night and taking her to a

remote hotel where he was the last and only person to be seen with Shaniya. Moreover, they were aware of the fact that he possessed information on the remote location of Shaniya, though he was unwilling to disclose how he had acquired that information, and that this information directed law enforcement to search a more specific area in the same vicinity in which an extensive search tracking defendant's cell phone data was already underway, suggesting that an incriminating discovery could be imminent. Even if defendant possessed a reasonable explanation for his actions that could exculpate him from directly causing harm to Shaniya, he was, at a minimum, likely to face charges of felony murder if, as feared, Shaniya was found deceased. Thus, while the disclosure certainly would be incriminating to defendant and could lead to the discovery of additional incriminating evidence against him, as proved to be the case here, the disclosure must be viewed in light of the already heavily incriminating evidence against defendat, as well as the apparent likelihood that the discovery of further incriminating evidence could be forthcoming.

Similarly, defendant argues that the "agreed-upon disposition" was inadequate in that his attorneys should have endeavored to obtain a more favorable outcome. For example, defendant argues that his attorneys should have attempted to secure an agreement from the State to proceed noncapitally, which he alleges would have both protected him from imposition of the death penalty and preserved his ability to assert a defense of factual innocence. But defendant fails to explain how making the disclosure with such an agreement in place would have in any way affected his ability

to assert a defense of factual innocence.  Here defendant was not required to plead guilty absent such an agreement; rather, he was free to put on any available evidence of his innocence, just as he would have been had the State proceeded noncapitally.

Additionally, defendant asserts that his attorneys should have attempted to secure a non-attribution agreement, which could have limited the State's use of any evidence regarding the disclosure solely to impeachment purposes at trial, or a proffer letter, which could have provided that the prosecutors would not use anything that defendant or his lawyers told them against defendant during the case-in-chief. Whether prosecutors would have been amenable to these considerations is speculative, but given the nature of the situation at that time—with the ongoing search for Shaniya and the considerable evidence against defendant—we are deeply skeptical.  Moreover, while we recognize that in many situations it would make strategic sense to attempt to negotiate for the best possible agreement before disclosing potentially incriminating information, that is not necessarily true in situations when, as here, time was a substantial factor.  Had law enforcement located Shaniya before defendant's disclosure, the opportunity to obtain any benefit in return for defendant's information would have been irrevocably lost.  Additionally, given that defendant was denying causing any harm to Shaniya, there was the possibility, however remote, that Shaniya was still alive.

Defendant attempts to minimize the role of time as a factor by suggesting that Shaniya might never have been discovered absent the disclosure, pointing to several

of the State's arguments at trial. For instance, defendant notes that the State argued at trial that Shaniya's body was "well hidden," "hardly visible," and "was very difficult to find -- and may not have been found without this information. Authorities had been searching in that general area and had not been able to locate the victim prior to this information." Given that a massive search was underway in the same general area in which Shaniya was ultimately discovered, we are skeptical of defendant's claim. More importantly, however, entertaining this type of speculative argument would be contrary to our mandate that "every effort be made to eliminate the distorting effects of hindsight" and "to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065, 80 L. Ed. 2d at 694. The information Rogers and Brewer received from defendant directed law enforcement to search a more specific area in the same vicinity in which an extensive search was already underway at that time, suggesting that a discovery could very well be imminent. Rogers and Brewer could in no way anticipate how well hidden or how difficult to discover the body of Shaniya might be, nor could they have anticipated receiving that information from defendant, who denied causing any harm to Shaniya. *See Sneed*, 284 N.C. at 614, 201 S.E.2d at 872 ("We think that the attorney-client relationship is such that when a client gives his attorney facts constituting a defense, the attorney may rely on the statement given unless it is patently false.").

In sum, we cannot agree with defendant that it was unreasonable for his attorneys to target a plea agreement for life in prison and the avoidance of the death

penalty in exchange for making the disclosure. We note that the commentary to

Guideline 10.9.1 from the same ABA Guidelines for the Appointment and

Performance of Defense Counsel in Death Penalty Cases cited by defendant, states:

> "Death is different because avoiding execution is, in many capital cases, the best and only realistic result possible"; as a result, plea bargains in capital cases are not usually "offered" but instead must be "pursued and won." Agreements are often only possible after many years of effort. Accordingly, this Guideline emphasizes that the obligation of counsel to seek an agreed-upon disposition continues throughout all phases of the case.

(Footnote call number omitted.) Certainly, the decision to consider a client's situation

as a potential capital case and seek a disposition accordingly is not one to be taken

lightly; on that account, we note that, as found by the trial court, Rogers and Brewer

were both experienced criminal defense attorneys. *See Strickland*, 466 U.S. at 681,

104 S. Ct. at 2061, 80 L. Ed. 2d at 689 ("Among the factors relevant to deciding

whether particular strategic choices are reasonable are the experience of the attorney

. . . ."). We hold only that under the unique and difficult circumstances here—with

the already heavily incriminating evidence against defendant, as well as the apparent

likelihood that the discovery of further incriminating evidence could be imminent—

and "indul[ging] a strong presumption that [defendant's attorneys'] conduct falls

within the wide range of reasonable professional assistance," *Id.* at 689, 104 S. Ct. at

2065, 80 L. Ed. 2d at 694, Rogers and Brewer's decision to disclose potentially

incriminating information with the sought-after goal of avoiding imposition of the

death penalty did not fall below "an objective standard of reasonableness," *id.* at 688, 104 S. Ct. at 2064, 80 L. Ed. 2d at 693.

Whether defendant's attorneys erred in not first securing, or attempting to secure, a plea agreement for life in prison before making the disclosure is a separate and more difficult question. On the one hand, as we have previously noted, any negotiations with prosecutors may have been an uphill battle and would have been further complicated by the issue of time. On the other hand, a plea agreement for life in prison would likely have been a more attainable benefit than the alternatives proffered by defendant in his brief (a non-attribution agreement or a proffer letter). Additionally, without any agreement firmly in place, defendant's attorneys exposed him to the possibility of further incrimination without any guaranteed benefit save for the existence of potential mitigating evidence at trial. Yet, we need not answer this question because, given that we have held that a plea agreement for life in prison and avoidance of the death penalty was a reasonable disposition in these circumstances, defendant cannot establish any prejudice when the State did offer defendant a plea agreement for life in prison. That is—even assuming *arguendo* that defendant's attorneys were deficient in disclosing the information without any plea agreement in place, defendant cannot show "a reasonable probability that, but for [his attorneys'] unprofessional errors, the result of the proceeding would have been different" when the very result that was desired did materialize and was rejected by defendant's own choice. *Id.* at 694, 104 S. Ct. at 2068, 80 L. Ed. 2d at 698.

### B. Adequate Investigation

Defendant next argues that his attorneys were deficient in their performance because they failed to conduct an adequate investigation before disclosing to police where to search for Shaniya when they were only one day into their representation of defendant. *See id.* at 691, 104 S. Ct. at 2066, 80 L. Ed. 2d at 695 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.") According to defendant, "everything turned" on his innocence defense, and his attorneys had a duty to adequately investigate that defense before destroying it by disclosing incriminating evidence to the State. Defendant argues that this disclosure was contrary to the applicable ABA guidelines, under which attorneys should investigate issues of guilt regardless of overwhelming evidence against a defendant or the defendant's own admissions or statements constituting guilt.

Defendant's assertions, however, are not borne out by the record. For example, defendant argues that Rogers failed to look at any formal discovery materials before making the disclosure. Yet, Rogers testified that at that early stage in the investigation, there was no discovery file to examine. Similarly, defendant seizes upon Rogers's response that he was unaware that defendant had at one point denied being the person depicted in photographs from the hotel, alleging that this statement demonstrates Rogers's failure to investigate defendant's claims of innocence. But we can find little significance in Rogers's statement. Defendant's "denial" occurred when

he was first confronted with photographs of himself and Shaniya taken from the Comfort Suites video footage. Defendant briefly attempted to claim that the person in the videos was someone who looked just like him, had somehow stolen his I.D. and car, and had signed into the hotel with defendant's name. Defendant quickly admitted it was he in the photographs, and then tried to claim he was delivering Shaniya to an unknown third party at the direction of text messages, which were not on defendant's phone and of which there is no record. Defendant fails to explain how Rogers's ignorance of defendant's short-lived denial of a fact relating to the *kidnapping*—a fact that was plainly apparent from available evidence, to which defendant shortly thereafter admitted and to which he later stipulated at trial—demonstrates any failure by Rogers to adequately investigate issues of defendant's guilt or innocence on the issue of *murder*.

Apart from defendant's brief denial, defendant is unable to identify anything that Rogers's allegedly inadequate investigation failed to uncover and which would have had any effect on the reasonableness of his attorneys' strategic decision to make the disclosure. *See Strickland*, 466 U.S. at 690-91, 104 S. Ct. at 2066, 80 L. Ed. 2d at 695 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."). Nor does defendant suggest precisely what other investigative avenues Rogers and

Brewer should have pursued. Rogers and Brewer discussed defendant's situation with him, and Rogers testified that he had conversations with Kimble to gauge the status of the investigation as it related to defendant's involvement. From these investigations, defendant's attorneys learned that defendant had kidnapped Shaniya in the middle of the night, and taken her to a hotel where he was the last person to be seen with her, and that searchers were presently conducting a massive, ongoing attempt to locate Shaniya by combing through the areas revealed by defendant's cell phone data. We conclude that defendant's attorneys' strategic choice here to disclose where to look for Shaniya was "made after thorough investigation of law and facts relevant to plausible options." *Id.* at 690, 104 S. Ct. at 2066, 80 L. Ed. 2d at 695. Even if defendant was able to identify some additional investigative steps his attorneys could have taken and to demonstrate that counsel engaged in a "less than complete investigation," we conclude that, given that time was a significant factor here, "reasonable professional judgments" would have "support[ed] the limitations on investigation." *Id.* at 691, 104 S. Ct. at 2066, 80 L. Ed. 2d at 695.

## C. Source of Disclosure

Next, defendant asserts that his attorneys erroneously advised him that they would shield his identity as the source of the information but that their method of disclosure revealed him as the source. Defendant argues that by doing so, his attorneys violated the Rules of Professional Conduct and the applicable ABA guidelines requiring a client's informed consent before lawyers may reveal

information acquired during the professional relationship. *See, e.g.*, N.C. St. B. Rev. R. Prof'l Conduct r. 1.6(a) (2018 Ann. R. N.C. 1183, 1205) ("A lawyer shall not reveal information acquired during the professional relationship with a client unless the client gives informed consent . . . .").

In support of his argument, defendant points to this exchange between Terry Alford, defendant's trial attorney, and Rogers at the hearing:

> Q      And so the discussion that you had with Mr. McNeill concerning the information, the authority that you had was to convey the information but not to reveal the source; is that correct?
>
> A      That was certainly our intent. And my recollection was just conveying the information, not saying Mario McNeill said anything or any specific person.
>
> Q      Right. And he never specifically gave you permission to be able to say the information came from him, did he?
>
> A      He did not specifically say, convey the information came from me.

Defendant asserts that because they agreed not to explicitly name him as the source of the disclosure, this agreement necessarily implied that his attorneys would not allow evidence from the disclosure to be attributed to him, either directly or by inference. According to defendant, this is reflected in Finding of Fact 9 from the trial court's 16 May 2013 order, in which the trial court found that defendant "did not authorize his attorneys to make any admissions on his behalf."

The record, however, cannot support defendant's characterization of the

agreement as being conditioned upon his attorneys' implicit promise that they would prevent the disclosure from being attributed to defendant, even by inference. Indeed, the entire purpose of the disclosure, to which defendant agreed, was that it be attributable to defendant to show cooperation on his part. Immediately before the portion of the hearing relied upon by defendant, Rogers testified:

> Q        That was the way it was done by Mr. Brewer is that he gave it as a recommendation. He didn't say where the information come from; is that correct?
>
> A        That is correct. And that is my best recollection of what I did so as well.
>
> Q        In other words, the information that you were relaying to the police was intended to be information you received from someone, but you did not want to relay who that came from; is that correct?
>
> A        That's correct.
>
> Q        At any time when you were talking to the authorities, did you tell them who it came from?
>
> A        No. No, I didn't.
>
> Q        So any belief that someone may have that information you gave them came from Mr. McNeill would be their speculation. You never specifically said where it came from, did you?
>
> A        No, I didn't.
>
> Q        That was because you weren't authorized by Mr. McNeill to specifically tell someone where that information came from, were you?
>
> A        No, that's not true. We were authorized.

Q     You were authorized to do what?

A     We were authorized to disclose the information.

Q     But were you authorized to disclose the source of the information?

A     In our conversation prior to disclosing the information, it was decided that the information would be provided *without specifically stating the source.*

Q     And that's the way Mr. Brewer did it, and that was your intention of doing it also, not to provide the source, correct?

A     That's correct.

(Emphasis added.) Rogers further explained that while it was agreed to convey the information without "specifically stating the source," they were also not trying to hide defendant's role in furnishing the information. As Rogers testified at the hearing:

Q     And when you're talking about getting mitigating information for the defendant, Mario McNeill, to use or to set him up down the road with having the benefit of having been helpful in providing her body, that sort of thing --

A     Yes.

Q     -- right? Being cooperative. He could be claimed to be cooperative, right?

A     That's correct.

Q     You're not hiding from Captain Kimble who you're getting the information from?

A     No, I'm not.

Q      You won't be able to claim any credit, or he won't be able to claim any credit down the road should he need it if it's a mystery as to where the information is coming from, right?

A      That's correct.

In light of Rogers's testimony and the agreed-upon purpose of the disclosure, the fact that defendant and his attorneys agreed not to explicitly name defendant as the source of the disclosure cannot be read as an implicit understanding that his attorneys would shield him as the source but rather must be read in the context of their conversation, in which defendant told his attorneys that he had information about Shaniya's location but did not explain how he had acquired that information, and in which defendant was "denying that he was involved in hurting [Shaniya] or killing her." The method of disclosure allowed an immediate inference of cooperation but avoided any inadvertent admission of guilt. While defendant relies heavily upon a portion of Finding of Fact 9, the trial court's full sentence from that finding states that "[t]he Defendant did not authorize his attorneys to make any admissions on his behalf, *and they did not make any admissions on his behalf."* (Emphasis added.) Similarly, in its previous order from 17 April 2013, the trial court found that defendant "authorized Mr. Rogers to provide that specific information to law enforcement" and that "[t]he Defendant's information . . . did not constitute *an admission to a crime."* (Emphasis added.) Thus, while the record establishes that defendant's attorneys were not authorized to make any admissions of guilt to any

crimes on behalf of defendant, it does not support defendant's assertion that they advised him they would shield his identity as the source of the information.

Certainly, that the information came from defendant's attorneys allowed an inference that defendant was the source, which, while demonstrating immediate cooperation on the part of defendant, was also potentially incriminating as it suggested an inference of guilt. But this trade-off goes to the heart of the agreed-upon strategy—the mounting evidence against defendant was already highly incriminating, and providing this information to the police that could potentially be further incriminating was a strategic decision made to avoid imposition of the death penalty.

Whether defendant's attorneys *should have* advised him to adopt a different strategy that attempted to disclose the information anonymously and to shield defendant's identity as the source—perhaps until the sentencing proceeding of a capital trial—is a separate question not specifically raised by defendant, but on these facts we can see little to be gained, and more importantly, no constitutional deficiency, in failing to take such a course. Defendant's attorneys clearly believed that disclosing the information without hiding his identity was the best way to demonstrate cooperation and receive a benefit for the information while avoiding any overt suggestion of guilt on the part of defendant. Either defendant possessed an exculpatory explanation as to how he had acquired information on Shaniya's location, which he was at that point unwilling to share with his attorneys, or he did not. If he

was being truthful with his attorneys in denying causing any harm to Shaniya, then he did possess such an explanation, and his attorneys' overt omission of his name in making the disclosure cleared the path for him to rebut the inference of guilt via any available evidence that an unnamed third party was the ultimate source of the information. This was the scenario defendant argued in his closing, albeit without any evidentiary support.

### Ineffective Assistance of Counsel Conclusion

In sum, we conclude that defendant has failed to meet his burden under *Strickland* and we find no error in the trial court's ruling. The strategy employed by Rogers and Brewer here, to which defendant agreed, was a result of their "trying to give [defendant] the best advice [they could] to try to help save his life." Significantly, defendant agreed with this strategy, and he received the very benefit sought by this strategy when the State later offered him a plea agreement for life in prison, which defendant twice declined. Defendant also declined to present any mitigating evidence in the sentencing proceeding of the trial, thus rejecting a further benefit contemplated by his agreed-upon strategy. Accordingly, defendant's ineffective assistance of counsel claim is overruled.

### *Cronic* claim

In addition to arguing that he received ineffective assistance of counsel under *Strickland*, defendant also argues that he received ineffective assistance under the standard set forth in *United States v. Cronic*, 466 U.S. 648, 104 S. Ct. 2039, 80 L. Ed.

2d 657 (1984). In *Strickland* the Court considered "claims of ineffective assistance based on allegations of specific errors by counsel—claims which, by their very nature, require courts to evaluate both the attorney's performance and the effect of that performance on the reliability and fairness of the proceeding." *Strickland*, 466 U.S. at 702, 104 S. Ct. at 2072, 80 L. Ed. 2d at 703 (Brennan, J., concurring in the opinion). On the other hand, in *Cronic* the Court considered ineffective assistance of counsel claims in the context of cases in which there is a "complete denial of counsel," "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing," or "the surrounding circumstances [make] it so unlikely that any lawyer could provide effective assistance that ineffectiveness [is] properly presumed without inquiry into actual performance at trial." *Cronic*, 466 U.S. at 659-61, 104 S. Ct. at 2047-48, 80 L. Ed. 2d at 668-69.

Defendant argues that his attorneys, by disclosing of the location of Shaniya to police without first securing any benefit in return, were essentially working for the police and that this situation resulted in a breakdown of the adversarial process under *Cronic*. We are unpersuaded. Defendant's challenge is more properly brought as an allegation of a specific error under *Strickland*, which we have already addressed. Moreover, for the reasons previously stated, we conclude that the attorneys' disclosure was a reasonable strategic decision made in the course of their representation of defendant and certainly did not amount to a "breakdown in the adversarial process that would justify a presumption that respondent's conviction

was insufficiently reliable to satisfy the Constitution." *Id.* at 662, 104 S. Ct. at 2049, 80 L. Ed. 2d at 670.

Attorney-Client Privilege

Defendant next argues that the information regarding the location of Shaniya was inadmissible by virtue of the attorney–client privilege. "It is an established rule of the common law that confidential communications made to an attorney in his professional capacity by his client are privileged, and the attorney cannot be compelled to testify to them unless his client consents." *Dobias v. White*, 240 N.C. 680, 684, 83 S.E.2d 785, 788 (1954) (citations omitted). Significantly, however, "not all communications between an attorney and a client are privileged," *In re Investigation of Miller*, 357 N.C. 316, 335, 584 S.E.2d 772, 786 (2003) (citations omitted), but rather, "[o]nly *confidential* communications are protected," *Dobias*, 240 N.C. at 684, 83 S.E.2d at 788 (emphasis added). "For example, . . . if it appears that a communication was not regarded as confidential or that the communication was made for the purpose of being conveyed by the attorney to others, the communication is not privileged." *In re Miller*, 357 N.C. at 335, 584 S.E.2d at 786 (citing *State v. McIntosh*, 336 N.C. 517, 524, 444 S.E.2d 438, 442 (1994)).

The party asserting the privilege has the burden of establishing each of the essential elements of a privileged communication. *Id.* at 336, 584 S.E.2d at 787 (quoting 1 Scott N. Stone & Robert K. Taylor, *Testimonial Privileges* § 1.61, at 1–161 (2d ed. 1994) (citations omitted) ("This burden may not be met by 'mere conclusory or

ipse dixit assertions,' or by a 'blanket refusal to testify.' Rather, sufficient evidence must be adduced, usually by means of an affidavit or affidavits, to establish the privilege with respect to each disputed item.")). This Court has held that the elements of a privileged communication are:

> (1) the relation of attorney and client existed at the time the communication was made, (2) the communication was made in confidence, (3) the communication relates to a matter about which the attorney is being professionally consulted, (4) the communication was made in the course of giving or seeking legal advice for a proper purpose although litigation need not be contemplated and (5) the client has not waived the privilege.

*State v. Murvin*, 304 N.C. 523, 531, 284 S.E.2d 289, 294 (1981) (citation omitted). Finally, "the responsibility of determining whether the attorney-client privilege applies belongs to the trial court." *In re Miller*, 357 N.C. at 336, 584 S.E.2d at 787 (citing *Hughes v. Boone*, 102 N.C. 137, 160, 9 S.E. 286, 292 (1889)).

Here the trial court determined that defendant failed to meet his burden of demonstrating that the information he provided to his attorneys concerning the location of Shaniya was privileged. In its order denying defendant's Motion to Require Specific Performance or, Alternatively, to Suppress Statements and Evidence, the trial court found as fact:

> 6. During Mr. Rogers' representation, the Defendant provided specific information to Mr. Rogers as to the location of Shaniya Davis' body, and the Defendant authorized Mr. Rogers to provide that specific information to law enforcement.

7. Pursuant to the Defendant's authorization, Mr. Rogers provided to law enforcement that specific information as to the location of Shaniya Davis' body.

8. The Defendant's information regarding the location of Shaniya Davis' body did not constitute an admission to a crime.

In its second order, the trial court adopted and incorporated all of its findings from its previous order, and additionally found as fact:

5. During their representation of the Defendant, Mr. Brewer and Mr. Rogers talked to the Defendant while he was in jail about cooperating with the police in looking for Shaniya Davis. They discussed how the Defendant might benefit from cooperating with the police on this issue by avoiding the imposition and execution of the death penalty. During these discussions, the Defendant specifically authorized his attorneys, Brewer and Mr. Rogers, to give information to the police relating to the location of Shaniya Davis. Nothing about their discussions suggests that the Defendant involuntarily provided the information at issue to his attorneys.

. . . .

9. The Defendant authorized his attorneys to communicate information to the police that would aid them in locating Shaniya Davis. The Defendant did not authorize his attorneys to make any admissions on his behalf, and they did not make any admissions on his behalf. Neither Mr. Rogers nor Mr. Brewer told Captain Kimble the specific source of the information as to the directions where to search. . . . .

. . . .

15. Contrary to the Defendant's argument, the Defendant did not meet his burden of demonstrating that the statements at issue were privileged communications. The evidence shows that they do not fall within the protection of the attorney-client privilege because they were not confidential. The statements at issue were not regarded by the Defendant and his attorneys as confidential as they were made for the purpose of being conveyed by the attorney to others and were therefore not privileged.

16. Even assuming that the attorney-client privilege existed, the Defendant waived the privilege in respect to the information given to the police for the sole purpose of allowing his attorneys to share the information with the police. This information was not given in exchange for any plea deal, dismissal of charges, immunity, or any other incentive or inducement offered by the State, and this information was not given during any plea negotiations with the District Attorney or any of his staff under N.C. Gen. Stat. § 8C-1, Rule 410.

. . . .

22. The Defendant waived the attorney-client privilege in that he specifically intended the information that he gave to his attorneys about the location of Shaniya Davis be shared with the authorities for the sole purpose of locating Shaniya Davis, the Defendant authorized the limited disclosure of this information for that limited purpose, there is no evidence of any deal to disclose this information, the disclosure was not the result of plea negotiations, the disclosure was voluntary, and there is no evidence of the Defendant's motive for the disclosure other than an interest on the part of the Defendant that Shaniya Davis would be found and that he might avoid the imposition and execution of the death penalty.

23.    The defendant has not waived his privilege in regard to his attorneys testifying in this case on the trial on the merits.

Based upon these findings of fact, the trial court concluded:

4.    The Defendant waived the attorney-client privilege as to some of this information. As to the information that Mr. Brewer and Mr. Rogers supplied to Captain Kimble, the attorney-client privilege did not exist because the information was not given to the attorneys in confidence as the Defendant voluntarily gave the information to his attorneys for the purpose of his attorneys sharing it with the police, and even if the attorney-client privilege did exist, that the defendant waived the attorney-client privilege so that his attorneys could share that information with the authorities.

. . . .

13.    The Defendant waived the attorney-client privilege in that he specifically intended the information that he gave to his attorneys about the location of Shaniya Davis he shared with the authorities for the sole purpose of locating Shaniya Davis, the Defendant authorized the limited disclosure of this information for that limited purpose, there is no evidence of any deal to disclose this information, the disclosure was not the result of plea negotiations, the disclosure was voluntary, and there is no evidence of the Defendant's motive for the disclosure other than an interest on the part of the Defendant that Shaniya Davis would be found and that he might avoid the imposition and execution of the death penalty.

14.    None of the Defendant's rights under the United States Constitution, North Carolina Constitution, or the North Carolina General Statutes were violated.

We conclude that the trial court correctly determined that the information was not protected by attorney–client privilege. Specifically, the testimony of Rogers and Brewer plainly establishes that defendant communicated the information to them with the purpose that it be relayed to law enforcement to assist in the search for Shaniya. Accordingly, the evidence establishes that defendant's communication of the information to his attorneys "was made for the purpose of being conveyed by the attorney[s] to others," and as a result, "the communication is not privileged." *In re Miller*, 357 N.C. at 335, 584 S.E.2d at 786 (citing *McIntosh*, 336 N.C. at 524, 444 S.E.2d at 442).

Nonetheless, defendant argues on appeal that any waiver of the privilege on his part (or any intention that the information be conveyed to others) was made under the condition that he not be revealed as the source of the information. Defendant contends that his attorneys breached this condition by disclosing the information without protecting his identity as the source, rendering any waiver a nullity and leaving intact the privileged status of the information. Defendant further asserts that, at a minimum, his identity as the source of the information was privileged and should have been protected against any comment or infringement by the State. According to defendant, the trial court, by allowing evidence at trial that the information came from his attorneys and by allowing the State to argue inferences of guilt from that evidence, deliberately invaded the attorney–client relationship and violated his federal and state rights to counsel under the Sixth Amendment to the

United States Constitution and Article I, Section 23 of the North Carolina Constitution.

Defendant's contentions, however, are again premised on the same portions of the record on which he based his previous argument that his attorneys breached their duty of confidentiality[10] and provided ineffective assistance of counsel. For instance, defendant again refers to the trial court's Finding of Fact 9, which states that defendant "did not authorize his attorneys to make any admissions on his behalf." Yet, as noted above, this finding, in which the trial court continued by stating "and they did not make any admission on his behalf," references *admissions to a crime*. As we have previously concluded, while the record establishes that defendant's attorneys

---

[10] While the attorney–client privilege and the ethical duty of confidentiality are related principles, they are not synonymous, and the applicability here of the former is questionable given that the disclosure of purportedly confidential information was not made pursuant to compulsion of law over the objection of defendant, but rather was made voluntarily and out of court. *See* N.C. St. B. Rev. R. Prof'l Conduct r. 1.6(a) cmt. 3 (2018 Ann. R. N.C. at 1205) ("The principle of client-lawyer confidentiality is given effect by related bodies of law: the attorney-client privilege, the work product doctrine and the rule of confidentiality established in professional ethics. The attorney-client privilege and work-product doctrine apply in judicial and other proceedings in which a lawyer may be called as a witness or otherwise required to produce evidence concerning a client. The rule of client-lawyer confidentiality applies in situations other than those where evidence is sought from the lawyer through compulsion of law. The confidentiality rule, for example, applies not only to matters communicated in confidence by the client but also to all information acquired during the representation, whatever its source. A lawyer may not disclose such information except as authorized or required by the Rules of Professional Conduct or other law." (citation omitted)); *Dobias*, 240 N.C. at 684, 83 S.E.2d at 788 ("It is an established rule of the common law that confidential communications made to an attorney in his professional capacity by his client are privileged, *and the attorney cannot be compelled to testify to them unless his client consents.*" (emphasis added)). In any event, for the reasons stated above, the information defendant communicated to his attorneys was not privileged.

were not authorized to make any admissions of guilt to any crimes on behalf of defendant, and that they made no such admissions, the record does not support defendant's characterization of the agreement as being conditioned upon his attorneys' representation that they would prevent the disclosure from being attributed to defendant, even by inference. Defendant's arguments to the contrary are overruled.

### Hearsay - Admissions by a Party–Opponent

Defendant next contends that Captain Kimble's testimony that he received information on the location of Shaniya from defendant's attorneys was inadmissible hearsay and that the trial court erred in denying defendant's motion to suppress this testimony. We disagree.

" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C.G.S. § 8C-1, Rule 801(c) (2017); *see also id.* Rule 801(a) (2017) (defining "statement" as "(1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by him as an assertion"). "In general, hearsay evidence is not admissible." *State v. Rivera*, 350 N.C. 285, 288-89, 514 S.E.2d 720, 722 (1999) (citing *State v. Wilson,* 322 N.C. 117, 131-32, 367 S.E.2d 589, 598 (1988)). An exception to the hearsay rule exists in Rule 801(d), which provides in pertinent part:

> (d) Exception for Admissions by a Party-Opponent.
> – A statement is admissible as an exception to the hearsay
> rule if it is offered against a party and it is . . . (C) a

statement by a person authorized by him to make a statement concerning the subject, or (D) a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship[.]

N.C.G.S. § 8C-1, Rule 801(d) (2017).

Here defendant objected to the admission of Kimble's testimony about statements made to him by defendant's attorneys concerning the location of Shaniya on the basis that, *inter alia*, such testimony was inadmissible hearsay. The trial court determined that defendant's attorneys' statements to Kimble were admissible under N.C.G.S. § 8C-1, Rule 801(d). Accordingly, the trial court ordered that:

The State may call Assistant Chief Kimble as a witness, and he may testify pursuant to N.C. Gen. Stat. § 8C-1, Rule 801(d) about his conversations with Mr. Brewer and Mr. Rogers inasmuch as these attorneys were the Defendant's agents and were authorized by the Defendant to make the statements at issue . . . .

The trial court did not allow Kimble to testify "as to any feelings about the source of the information."

Defendant argues that because the trial court found that he "did not authorize his attorneys to make any *admissions* on his behalf," and yet admitted into evidence his attorneys' statements to Kimble pursuant to N.C.G.S. § 8C-1, Rule 801(d) under the "*Admissions* by a Party-Opponent" hearsay exception, the trial court erroneously allowed defendant's attorneys' disclosure to be admitted as defendant's own statement and to be attributed to him, resulting in prejudice and requiring a new

trial. (Emphases added.) The consonance of the word "admission" may appear contradictory here at first glance, but this argument too is without merit.

As previously discussed, in Finding of Fact 9 the trial court determined that defendant did not authorize his attorneys to make any admissions of guilt *to any crimes* and, on that account, "they did not make any admissions on his behalf." As the trial court specifically found in its earlier order, defendant "authorized Mr. Rogers to provide that specific information to law enforcement" and "[t]he Defendant's information . . . did not constitute *an admission to a crime*." (Emphasis added.) It is clear that the trial court's meaning of "admission" in this respect was more akin to a "confession," which is "an acknowledgement in express[ed] words by [the] accused in a criminal case of his guilt [of] the crime charged or of some essential part of it." *State v. Trexler*, 316 N.C. 528, 531, 342 S.E.2d 878, 880 (1986) (quoting *State v. Fox*, 277 N.C. 1, 25, 175 S.E.2d 561, 576 (1970)).

In contrast, this Court has defined "admission" in the context of Rule 801(d) more broadly as "a statement of pertinent facts which, in light of other evidence, is incriminating." *State v. Lambert*, 341 N.C. 36, 50, 460 S.E.2d 123, 131 (1995) (quoting *Trexler*, 316 N.C. at 531, 342 S.E.2d at 879-80); *see also State v. Chapman*, 359 N.C. 328, 355, 611 S.E.2d 794, 816 (2005) (referring to the Rule 801(d) exception when applied to a defendant's statement as the "*statement* of a party opponent" (emphasis added)); *Trexler*, 316 N.C. at 531, 342 S.E.2d at 880 ("A confession, therefore, is a type of an admission." (citations omitted)). Under this broad definition, the "Admissions

by a Party-Opponent" hearsay exception encompasses more than mere admissions of guilt. *See, e.g., Chapman*, 359 N.C. at 355, 611 S.E.2d at 816 (concluding that the defendant's statement to a detective about a threatening telephone call he received the day after the murder of which he was accused was admissible as the statement of a party opponent); *State v. Collins*, 335 N.C. 729, 738, 440 S.E.2d 559, 564 (1994) (opining that the defendant's comments concerning his previous statements about threats he had made to his wife before her death fell within the exception for admissions by a party opponent). As a result, the trial court's admitting of defendant's attorneys' statements under Rule 801(d) did not conflict with Finding of Fact 9, which explicitly found that defendant "did not authorize his attorneys to make any admissions on his behalf, and they did not."

Because, as discussed previously, defendant authorized his attorneys to convey the information to law enforcement, the trial court did not err in admitting the evidence as "statement[s] by a person authorized by [defendant] to make a statement concerning the subject." N.C.G.S. § 8C-1, Rule 801(d)(C). Moreover, consistent with defendant's agreement with his attorneys that he not specifically be named as the source, the trial court did not permit Kimble to testify "as to any feelings about the source of the information."[11] Certainly, one could infer that defendant was the

---

[11] Defendant argues that admission of the statements under Rule 801(d) means that they came in as defendant's own statements and were directly attributable to him. However, the jury was not informed of the manner in which this evidence was admitted—in other words, that the statements were authorized by defendant. The jury could only infer that

ultimate source of information that came from his attorneys. At trial, the State repeatedly argued this inference; however, as discussed above, this argument was an inevitable result of the agreed-upon strategy in making the disclosure. Defendant's arguments are overruled.

## Due Process

Next, defendant argues that the cumulative effect of his original attorneys' ineffective assistance of counsel, combined with the trial court's admission into evidence of testimony that his lawyers disclosed the location of Shaniya to police, as well as its admission of all evidence recovered from that location and all evidence derived from the discovery of Shaniya's body, deprived defendant of a fair trial in violation of his rights to due process of law under the Fourteenth Amendment to the United States Constitution and the Law of the Land Clause of the North Carolina Constitution. Because we have held that defendant did not receive ineffective assistance of counsel and that the trial court did not err in any evidentiary rulings, defendant's contentions are without merit.

## Improper Statements During the State's Closing Argument

Defendant's next argument concerns two statements made by the State during closing arguments at the guilt-innocence proceeding of the trial. More specifically,

---

defendant was the source from the fact that the attorneys who possessed the information represented him. As previously discussed, while inference was incriminating, it was permissible in light of the agreed-upon disclosure.

defendant argues that because these two comments severely prejudiced him, the trial court abused its discretion in denying his repeated requests for a mistrial. We do not agree.

A trial court "must declare a mistrial upon the defendant's motion if there occurs during the trial . . . conduct inside or outside the courtroom, resulting in substantial and irreparable prejudice to the defendant's case." N.C.G.S. § 15A-1061 (2017). The determination "as to whether substantial and irreparable prejudice has occurred lies within the sound discretion of the trial judge and . . . will not be disturbed on appeal absent a showing of abuse of discretion." *State v. Thomas*, 350 N.C. 315, 341, 514 S.E.2d 486, 502 (1999) (citing *State v. McNeill*, 349 N.C. 634, 646, 509 S.E.2d 415, 422 (1998), *cert. denied*, 528 U.S. 838, 120 S. Ct. 102, 145 L. Ed. 2d 87 (1999)), *cert. denied*, 528 U.S. 1006, 120 S. Ct. 503, 145 L. Ed. 2d 388 (1999); *see also State v. Taylor*, 362 N.C. 514, 538, 669 S.E.2d 239, 260 (2008) ("An abuse of discretion occurs when a ruling is 'manifestly unsupported by reason, which is to say it is so arbitrary that it could not have been the result of a reasoned decision.' " (quoting *State v. T.D.R.*, 347 N.C. 489, 503, 495 S.E.2d 700, 708 (1998))), *cert. denied*, 558 U.S. 851, 130 S. Ct. 129, 175 L. Ed. 2d 84 (2009). Further, "[t]he decision of the trial judge is entitled to great deference since he is in a far better position than an appellate court to determine the effect of any such error on the jury." *Thomas*, 350 N.C. at 341, 514 S.E.2d at 502 (citing *State v. King*, 343 N.C. 29, 44, 468 S.E.2d 232, 242 (1996)). We also note that "[m]istrial is a drastic remedy, warranted only for such

serious improprieties as would make it impossible to attain a fair and impartial verdict." *State v. Smith*, 320 N.C. 404, 418, 358 S.E.2d 329, 337 (1987) (quoting *State v. Stocks*, 319 N.C. 437, 441, 355 S.E.2d 492, 494 (1987)).

Defendant's motions for mistrial here were based on statements made by the prosecutor in the State's closing arguments. During closing arguments "an attorney may not become abusive, inject his personal experiences, express his personal belief as to the truth or falsity of the evidence or as to the guilt or innocence of the defendant, or make arguments on the basis of matters outside the record." N.C.G.S. § 15A-1230(a) (2017). We have recognized, however, that prosecutors " 'are given wide latitude in the scope of their argument' and may 'argue to the jury the law, the facts in evidence, and all reasonable inferences drawn therefrom.' " *State v. Goss*, 361 N.C. 610, 626, 651 S.E.2d 867, 877 (2007) (quoting *State v. Alston*, 341 N.C. 198, 239, 461 S.E.2d 687, 709-10 (1995), *cert. denied*, 516 U.S. 1148, 116 S. Ct. 1021, 134 L. Ed. 2d 100 (1996)), *cert. denied*, 555 U.S. 835, 129 S. Ct. 59, 172 L. Ed. 2d 58 (2008). The trial court may ordinarily remedy improper argument with curative instructions "since it is presumed that jurors will understand and comply with the instructions of the court," *State v. Young*, 291 N.C. 562, 573, 231 S.E.2d 577, 584 (1977) (first citing *State v. Sparrow*, 276 N.C. 499, 173 S.E.2d 897 (1970); then citing *State v. Long*, 280 N.C. 633, 187 S.E.2d 47 (1972)), though "[s]ome transgressions are so gross and their effect so highly prejudicial that no curative instruction will suffice to remove the

adverse impression from the minds of the jurors," *id.* at 573-74, 231 S.E.2d at 584 (citations omitted).

Here, during its closing argument in the guilt-innocence proceeding of the trial, while commenting on defendant's theory of the crime, the prosecutor stated:

> Where was Shaniya's body found? Off Walker Road, past Spring Lake before you get to Sanford, exactly where the defendant's attorney said you would find the body. So that would mean that her people, her relatives that are going to take her to school that morning, they drive her right back up to Sanford, another 40 minute drive. They just happened to sexually assault her and dump her body where the cell phone analysis, *where the defendant's lawyer said he put the body*, where the metal identification says the body is and where the soil sample identification says the body is. And that's all just coincidence? The defense would have you believe that that's just coincidence.

(Emphasis added.) During the next recess, out of the presence of the jury, defendant's trial attorney objected to the prosecutor's comment and moved for a mistrial. Defendant's attorney argued to the trial court: "You made the lines. You drew the lines and that went way past the line -- way past the line. His statement was the body was found where his lawyer said he put the body." The trial court responded that it did not hear the comment and asked the court reporter to read back that portion of the State's argument. The trial court then stated, "All right. Motion for mistrial is denied. If you want me to tell them to disregard that, I'll be glad to tell them that. I didn't catch it. I'm not sure how many of them caught it." Defendant's

attorney declined, stating, "No, sir.  That would just be drawing more attention to the

error."  The trial court then said:

> All right.  Let's bring them in.  I have told the jury to
> remember the evidence for themselves.  If the lawyer says
> something they don't remember from the evidence, they are
> to disregard that and abide by their own recollection of the
> evidence.  Based on that and in my discretion, the motion
> for mistrial is denied.  And I will give them a cautionary
> instruction now -- a general cautionary instruction, not
> about that specifically but to -- in general, about remember
> the evidence, okay?

When the jury returned, the trial court instructed jurors:

> Let me remind you once again that closing arguments are
> not evidence.  The evidence is what you heard and saw
> during the presentation of evidence.  If, during the course
> of making a final argument, one or more of the attorneys
> attempts to restate the evidence or a portion of the evidence
> and your recollection of the evidence is different from the
> attorneys', you are to recall and remember the evidence
> and be guided exclusively by your own recollection of the
> evidence.

Later in the State's closing argument, the prosecutor asserted:

> He killed and left Shaniya on Walker Road.  The cell phone
> analysis puts him there.  The soil sample analysis puts him
> there.  The metal identification analysis puts him there.
> *And his defense attorney telling law enforcement where to
> look for the body puts him there.*

(Emphasis added.)  Defendant's attorney objected at the next recess and again moved

for a mistrial based on the prosecutor's stating "his defense attorney telling law

enforcement where to look for the body puts him there."  The trial court responded

that "I think it's the same as saying the metal and the minerals puts him there.  It's

an inference from what the attorney said. So your motion for mistrial is denied."

Defendant's attorney renewed his motion and asserted that the combination of the two comments should result in a mistrial. The trial court ruled:

> All right. Well, I find nothing wrong with the second incident that you're complaining of. I do find that he did cross by saying what I told him -- not what I told him not to but would not allow testimony that the defendant provided the information to the lawyer. He improperly commented on that in the first incident. In my discretion, I denied your request for mistrial. I gave a cautionary instruction to the jury and I do not feel like the comment rises to the point where I should declare a mistrial. I think that clarifies my ruling.

The trial court denied the defense's repeated renewals of its motions for mistrial.

Defendant argues that the prosecutor's statements that Shaniya's body was found "where the defendant's lawyer said he put the body" and that "[defendant's] attorney telling law enforcement where to look for the body puts him there" contravened the trial court's pretrial rulings concerning evidence of the disclosure and were without support in the record. Defendant asserts that these statements were severely prejudicial because they called on the jury to infer that he made confessions to his attorneys, which, if made, would have been privileged and inadmissible, and also to infer that defendant concealed the body, which defendant contends amounts to evidence of malice and of premeditation and deliberation. Additionally, defendant argues that the statements were so prejudicial that the trial court's general curative instructions did nothing to cure the impermissible inferences

urged by the State, nor could a more specific curative instruction have remedied the issue. As a result, defendant contends that the trial court abused its discretion in denying his motions for mistrial.

With regard to the second statement, namely, that "[defendant's] attorney telling law enforcement where to look for the body puts him there," we conclude that this statement was not improper. As discussed above, evidence that the information of Shaniya's location was conveyed to law enforcement by defendant's attorneys was properly admitted by the trial court and this evidence permitted reasonable inferences to be drawn that were incriminating to defendant. These inferences are precisely what the prosecutor argued here—that defendant was the ultimate source of the information and had been to that location. Thus, the prosecutor's statement was permissible because he was arguing "the facts in evidence, and . . . reasonable inferences drawn therefrom," *Goss*, 361 N.C. at 626, 651 S.E.2d at 877 (quoting *Alston*, 341 N.C. at 239, 461 S.E.2d at 709-10); *see also, e.g.*, *State v. Smith*, 294 N.C. 365, 379, 241 S.E.2d 674, 682 (1978) ("Since the evidence was properly admitted, the prosecutor was entitled to argue the full force of that evidence to the jury."). Defendant was free to rebut these inferences with any available evidence, as he sought to do in his closing argument. But defendant's objection to the incriminating nature of these inferences is in reality a reiteration of his previous arguments that the disclosure, and the admission of evidence relating to the disclosure, violated his

constitutional rights and resulted in prejudice. As we have already considered and rejected these arguments, defendant's contention here must fail as well.

On the other hand, the prosecutor's first statement that Shaniya's body was found "where the defendant's lawyer said he put the body" was improper. This statement was not couched as an inference but rather as an assertion of fact, which was not an accurate reflection of the evidence. Nonetheless, we conclude that this improper statement was not "such [a] serious impropriet[y] as would make it impossible to attain a fair and impartial verdict." *Smith*, 320 N.C. at 418, 358 S.E.2d at 337 (quoting *Stocks*, 319 N.C. at 441, 355 S.E.2d at 494). Given that the prosecutor was allowed to argue the reasonable inferences arising from the evidence of defendant's attorneys' disclosure, and did so repeatedly in his closing argument, this sole misstatement of that evidence did not run far afield of what was permissible. Had we arrived at a different conclusion with respect to defendant's previous arguments, the impropriety of this statement may have been more egregious.

Further, we note that the trial judge agreed the statement was improper once it was read back by the court reporter, but when it was originally uttered he did not notice the statement, which ultimately occupied a single line from an extensive closing argument spanning sixty-nine pages of the record. *See Young*, 291 N.C. at 573, 231 S.E.2d at 583 (noting that the prosecutor's statement at issue "comprises only a few lines from forty-one pages in the record devoted to the closing arguments for the State"). As the trial court stated when offering to give a specific curative

instruction, "If you want me to tell them to disregard that, I'll be glad to tell them that. I didn't catch it. I'm not sure how many of them caught it." This excerpt supports the trial court's discretionary ruling relating to the effect the statement may have had on the jury. Moreover, in addition to offering to give a specific curative instruction, the trial court gave a general curative instruction.

Additionally, the evidence against defendant was overwhelming. *See State v. Huey*, 370 N.C. 174, 181, 804 S.E.2d 464, 470 (2017) ("When this Court has found the existence of overwhelming evidence against a defendant, we have not found statements that are improper to amount to prejudice and reversible error." (citing *State v. Sexton*, 336 N.C. 321, 363-64, 444 S.E.2d 879, 903, *cert. denied*, 513 U.S. 1006, 115 S. Ct. 525, 130 L. Ed. 2d 429 (1994), *grant of postconviction relief aff'd*, 352 N.C. 336, 532 S.E.2d 179 (2000))). This evidence included, *inter alia*: defendant's initial denial to police of knowing Shaniya or being involved in her disappearance until confronted by photos from the hotel video cameras; the eyewitness and video evidence, as well as defendant's trial stipulation, of defendant taking Shaniya from Sleepy Hollow to the Comfort Suites and leaving the hotel with her; the small blanket that was discovered in the trash can and contained feces, blood, Shaniya's hair, and defendant's pubic hair; the DNA evidence of defendant's pubic hair on the hotel comforter; the cell phone information showing that defendant was near the location where the body was found and contradicting his story of receiving anonymous instructions and taking Shaniya to the dry cleaning establishment in Fayetteville;

the soil and metal fragment recovered from defendant's car that was uniquely consistent with the location where Shaniya's body was found; defendant's apparent attempt to kill himself after being confronted with the evidence against him; and the fact that the police received information on where to search for Shaniya from attorneys who were representing defendant. In light of the foregoing reasons, and affording "great deference" to the trial judge "since he is in a far better position than an appellate court to determine the effect of any such error on the jury," *Thomas*, 350 N.C. at 341, 514 S.E.2d at 502 (citing *King*, 343 N.C. at 44, 468 S.E.2d at 242), we conclude that the trial judge did not abuse his discretion in denying defendant's motions for a mistrial based upon the improper remark.

<u>Jury Instruction for Sex Offense and (e)(5) Aggravating Circumstance</u>

Defendant next argues that the trial court erred in the guilt-innocence proceeding by instructing the jury that it could find defendant guilty of sexual offense of a child if it found either vaginal or anal penetration because the State failed to present any evidence of anal penetration and because "it cannot be discerned from the record upon which theory or theories the jury relied in arriving at its verdict." *State v. Lynch*, 327 N.C. 210, 219, 393 S.E.2d 811, 816 (1990) (citing *State v. Pakulski*, 319 N.C. 562, 574, 356 S.E.2d 319, 326 (1987)). For the same reasons, defendant contends that the trial court erred in the sentencing proceeding by instructing the jury that it could find the (e)(5) aggravating circumstance that the "capital felony was

committed while the defendant was engaged in the commission of, or flight after committing, the act of a sexual offense with a child." We disagree.

"A trial judge should never give instructions to a jury which are not based upon a state of facts presented by some reasonable view of the evidence." *State v. Sweat*, 366 N.C. 79, 89, 727 S.E.2d 691, 698 (2012) (quoting *State v. Lampkins*, 283 N.C. 520, 523, 196 S.E.2d 697, 699 (1973)). Before a particular charge is submitted to the jury, "the trial court must find substantial evidence has been introduced tending to prove each essential element of the offense charged and that the defendant was the perpetrator of the offense." *State v. Williams*, 308 N.C. 47, 64, 301 S.E.2d 335, 346 (citing *State v. Powell*, 299 N.C. 95, 98, 261 S.E.2d 114, 117 (1980)), *cert. denied*, 464 U.S. 865, 104 S. Ct. 202, 78 L. Ed. 2d 177 (1983). In determining whether there is sufficient evidence to support every element of the offense charged, "[t]he evidence is to be considered in the light most favorable to the State; the State is entitled to every reasonable intendment and every reasonable inference to be drawn therefrom." *Powell*, 299 N.C. at 99, 261 S.E.2d at 117 (citations omitted). Similarly, in the sentencing proceeding, "[i]n determining the sufficiency of the evidence to submit an aggravating circumstance to the jury, the trial court must consider the evidence in the light most favorable to the State, with the State entitled to every reasonable inference to be drawn therefrom." *State v. Bell*, 359 N.C. 1, 32, 603 S.E.2d 93, 114 (2004) (quoting *State v. Anthony*, 354 N.C. 372, 434, 555 S.E.2d 557, 596 (2001), *cert.*

*denied*, 536 U.S. 930, 122 S. Ct. 2605, 153 L. Ed. 2d 791 (2002)), *cert. denied*, 544 U.S. 1052, 125 S. Ct. 2299, 161 L. Ed. 2d 1094 (2005).

Defendant asserts that the evidence of anal penetration was insufficient under our decision in *State v. Hicks*, 319 N.C. 84, 352 S.E.2d 424 (1987). There the defendant was convicted of first-degree sexual offense based upon a theory of anal penetration. *Id.* at 89-90, 352 S.E.2d at 425, 427. The only evidence of anal penetration was the seven-year-old victim's testimony that the defendant "put his penis in the back of me." *Id.* at 86, 90, 352 S.E.2d at 425, 427. Additionally, the physician who had examined the victim, when asked about evidence of "sexual intercourse anally," testified that there was "[n]one at all." *Id.* at 90, 352 S.E.2d at 427. We reversed the defendant's conviction, concluding that:

> Given the ambiguity of [the victim's] testimony as to anal intercourse, and absent corroborative evidence (such as physiological or demonstrative evidence) that anal intercourse occurred, we hold that as a matter of law the evidence was insufficient to support a verdict, and the charge of first degree sexual offense should not have been submitted to the jury.

*Id.* at 90, 352 S.E.2d at 427. Defendant argues that *Hicks* is controlling here because while the autopsy revealed injuries to Shaniya's vaginal area, there was "no evidence of rectal injury;"[12] however, defendant's reliance upon *Hicks* is misplaced.

---

[12] Defendant also argues that the State's evidence failed to reveal any semen, spermatozoa, or male DNA on the rectal swabs, nor was any found on Shaniya's panties. We note that there was expert testimony from a DNA expert, stating that the absence of DNA was not unexpected because DNA begins to degrade or break down over time and that beyond

As an initial matter, we note that evidence of an apparent injury is not dispositive on the issue of penetration. *See, e.g., State v. Smith*, 315 N.C. 76, 102, 337 S.E.2d 833, 850 (1985) (stating that "no medical evidence of penetration, such as bruising or tearing, is required to support" a conviction for first-degree sexual offense); *State v. Norman*, 196 N.C. App. 779, 782, 675 S.E.2d 395, 398 (in which an expert explained that the absence of anal damage does not mean sexual assault did not occur "because the anal area was meant to stretch without tearing"), *disc. rev. denied*, 363 N.C. 587, 683 S.E.2d 382 (2009). More importantly, while the autopsy revealed no apparent injury, here there was sufficient other evidence that was lacking in *Hicks*. In this case, a Kastle-Meyer or phenolphthalein test, which is a test used to give the indication of whether blood is present on an item, indicated the presence of blood in Shaniya's anus. This chemical analysis also revealed a positive indication for the presence of blood in the crotch area of Shaniya's panties, as well on the bottom rear portion of Shaniya's shirt. Additionally, there was the circumstantial evidence on the rail and steps of the trailer of feces which had not been present the previous night. Further, in a nearby trash can, police discovered a child's blanket that had previously been in the living room of the trailer and that also contained feces, as well as blood, Shaniya's hair, and defendant's pubic hair. This trash can was located

a 72 hour window it becomes more and more likely that it will not be recoverable. Special Agent Hughes also testified that environmental conditions can affect how quickly DNA breaks down. Here Shaniya was missing for over six days.

across the street from the Davis residence and in close proximity to where defendant had parked his car the previous night—after he had texted multiple women and driven to the trailer park with the apparent hope of connecting with one of them. We hold that this evidence, taken in the light most favorable to the State, was sufficient to submit to the jury the issue of defendant's guilt of sexual offense, as well as the (e)(5) aggravating circumstance related to a sexual offense, based upon a theory of anal penetration. Defendant's arguments are overruled.

<u>Voluntariness of Defendant's Statements to Police</u>

Defendant next argues that the trial court erred in denying his motion to suppress statements he made during his interview with police on 12 November 2009.[13] This argument is without merit.

"The standard of review in evaluating the denial of a motion to suppress is whether competent evidence supports the trial court's findings of fact and whether

---

[13] Defendant also argues that certain evidence of his conduct—specifically that, during a break in the interrogation, he twice put a key into a wall electrical socket—should also have been inadmissible as "fruit of the involuntary statements." Defendant, however, did not challenge the admission of this conduct in the trial court and raises this issue for the first time on appeal. Accordingly, "[d]efendant has failed to properly preserve this issue because of his failure to raise it before the trial court." *State v. Gainey*, 355 N.C. 73, 100, 558 S.E.2d 463, 480 (first citing N.C. R. App. P. 10(b)(1); then citing *State v. Eason*, 328 N.C. 409, 420, 402 S.E.2d 809, 814 (1991)), *cert. denied*, 537 U.S. 896, 123 S. Ct. 182, 154 L. Ed. 2d 165 (2002). Further, defendant has not requested plain error review of this issue. *See* N.C. R. App. P. 10(4) ("In criminal cases, an issue that was not preserved by objection noted at trial and that is not deemed preserved by rule or law without any such action nevertheless may be made the basis of an issue presented on appeal when the judicial action questioned is specifically and distinctly contended to amount to plain error.").

the findings of fact support the conclusions of law." *Biber*, 365 N.C. at 167-68, 712 S.E.2d at 878 (citing *State v. Brooks*, 337 N.C. 132, 140-41, 446 S.E.2d 579, 585 (1994)). We review conclusions of law de novo. *Id.* at 168, 712 S.E.2d at 878 (citing *McCollum*, 334 N.C. at 237, 433 S.E.2d at 160).

While defendant's primary contention in the trial court was that he was subjected to custodial interrogation without the requisite *Miranda* warnings, he has abandoned that argument on appeal and instead contends solely that his statements were not voluntarily made, rendering their admission into evidence a violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, Sections 19 and 23 of the North Carolina Constitution. The test for voluntariness is whether, under the totality of the circumstances, "the confession [is] the product of an essentially free and unconstrained choice by its maker," in which event it is admissible, or instead whether a defendant's "will has been overborne and his capacity for self-determination critically impaired," in which event "the use of his confession offends due process." *Culombe v. Connecticut*, 367 U.S. 568, 602, 81 S. Ct. 1860, 1879, 6 L. Ed. 2d 1037, 1057-58 (1961) (citing *Rogers v. Richmond*, 365 U.S. 534, 544, 81 S. Ct. 735, 741, 5 L. Ed. 2d 760, 768 (1961)); *see also State v. Hardy*, 339 N.C. 207, 222, 451 S.E.2d 600, 608 (1994) ("The test for voluntariness in North Carolina is the same as the federal test." (citing *State v. Jackson*, 308 N.C. 549, 581, 304 S.E.2d 134, 152 (1983), *judgment vacated and remanded*, 479 U.S. 1077, 107 S.

Ct. 1271, 94 L. Ed. 2d 133 (1987), *aff'd on remand*, 322 N.C. 251, 368 S.E.2d 838 (1988), *cert. denied*, 490 U.S. 1110, 109 S. Ct. 3165, 104 L. Ed. 2d 1027 (1989))).

According to defendant, despite his initial denials to police that he was involved in the disappearance of Shaniya, which demonstrated his will not to make a statement, the detectives made promises, threats, and other coercive comments that overcame defendant's will after fifty-four minutes and caused him to make certain statements, including his admission to taking Shaniya from Sleepy Hollow to the Comfort Suites as well as his story about receiving instructions on his telephone from an unnamed third party. Defendant contends that the trial court erred by finding that the investigating officers did not make any promises or threats and by concluding that his statements were voluntarily made. We need not address these contentions, however, because, as the State argues, even if defendant was able to establish any error by the trial court in admitting these statements, such error would be harmless beyond a reasonable doubt. *See* N.C.G.S. § 15A-1443(b) (2017) ("A violation of the defendant's rights under the Constitution of the United States is prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt. The burden is upon the State to demonstrate, beyond a reasonable doubt, that the error was harmless.").

While a confession is prejudicial because it is the "best evidence" of a defendant's guilt, *State v. Fox*, 274 N.C. 277, 289, 163 S.E.2d 492, 501 (1968), defendant did not confess to murder or sexual assault. On the contrary, even after

the point at which defendant's will was purportedly overborne, he denied causing any harm to Shaniya. Defendant's sole admission was that he had taken Shaniya from Sleepy Hollow to the Comfort Suites—a fact to which he stipulated at trial and that he does not dispute on appeal.

Any prejudice caused by the admission of defendant's statements would be limited to the effect on his credibility. For example, the State was able to present evidence of defendant's phone records and cellular location data that tended to disprove defendant's story about receiving instructions on his phone from an unnamed third party to take Shaniya to a dry cleaning establishment at the corner of Country Club Drive and Ramsey Street in Fayetteville. Further, towards the end of the interview with police, defendant denied making his earlier statements, which would both contradict his earlier statements and also his stipulation at trial. Yet, this was not the only evidence tending to damage defendant's credibility. For instance, defendant's suppression argument would have no effect on the admissibility of his statements made before the point at which he contends his will was overborne, including his various denials of being at Brenda Davis's trailer, of seeing Shaniya or even knowing her, of having Shaniya in his car, of taking her to the hotel in Sanford, and of being the person seen on video recordings checking into the hotel under defendant's name and with his identification. Similarly, there was the evidence that defendant had told both of the clerks at the Comfort Suites that he was traveling with his daughter and taking her to her mother in Virginia. Given the overwhelming

evidence of defendant's guilt presented at trial, we conclude that any conceivable effect on defendant's credibility caused by the admission of his statements would be harmless beyond a reasonable doubt. *See State v. Autry*, 321 N.C. 392, 400, 364 S.E.2d 341, 346 (1988) ("Significantly, this Court has held that the presence of overwhelming evidence of guilt may render error of constitutional dimension harmless beyond a reasonable doubt." (citing *State v. Brown*, 306 N.C. 151, 164, 293 S.E.2d 569, 578, *cert. denied*, 459 U.S. 1080, 103 S. Ct. 503, 74 L. Ed. 2d 642 (1982))).

## Racial Justice Act Hearing

Defendant next argues that the trial court erred in denying his motion under the Racial Justice Act to prohibit the State from seeking the death penalty without holding an evidentiary hearing.

The Racial Justice Act (RJA) became effective on 11 August 2009 and provided that "[n]o person shall be subject to or given a sentence of death or shall be executed pursuant to any judgment that was sought or obtained on the basis of race." N.C.G.S. § 15A-2010 (2009); Act of Aug. 6, 2009, ch. 464, 2009 N.C. Sess. Laws 1213. The RJA implemented a hearing procedure authorizing a defendant to raise an RJA claim either at the Rule 24 pretrial conference or in postconviction proceedings. N.C.G.S. § 15A-2012 (2009); Ch. 464, sec. 1, 2009 N.C. Sess. Laws at 1214-15. The RJA provided, in pertinent part:

> (a) The defendant shall state with particularity how the evidence supports a claim that race was a significant factor in decisions to seek or impose the

sentence of death in the county, the prosecutorial district, the judicial division, or the State at the time the death sentence was sought or imposed.

> (1)     The claim shall be raised by the defendant at the pretrial conference required by Rule 24 of the General Rules of Practice for the Superior and District Courts or in postconviction proceedings pursuant to Article 89 of Chapter 15A of the General Statutes.
>
> (2)     The court shall schedule a hearing on the claim and shall prescribe a time for the submission of evidence by both parties.

N.C.G.S. § 15A-2012; Ch. 464, sec. 1, 2009 N.C. Sess. Laws at 1214-15. The RJA was amended in 2012, *see* Act of June 21, 2012, ch. 136, secs. 3-4, 2012 N.C. Sess. Laws (Reg. Sess. 2012) 471, 471-73, and then repealed in its entirety in 2013, *see* Act of June 13, 2013, ch. 154, sec. 5, 2013 N.C. Sess. Laws 368, 372.

Defendant contends that although the RJA was amended, and ultimately repealed, the ex post facto clauses of the United States and North Carolina Constitutions, the Due Process Clause of the Fourteenth Amendment, Article I, Section 19 of the North Carolina Constitution, and North Carolina common law bar the application of the amended RJA or the repeal of the RJA to his rights under the original RJA. Further, defendant argues that despite the mandatory language of the original RJA that "[t]he court *shall* schedule a hearing on the claim and *shall* prescribe a time for the submission of evidence by both parties," N.C.G.S. § 15A-

2012(a)(2) (2009) (emphases added), the trial court erroneously denied his RJA motion without holding an evidentiary hearing.

Yet, assuming *arguendo* that any version of the RJA applies to defendant, he neglects to note that he himself did not follow the language of section 15A-2012(a)(1), which mandates that "[t]he claim *shall be raised by the defendant at the pretrial conference required by Rule 24 of the General Rules of Practice for the Superior and District Courts* or in postconviction proceedings pursuant to Article 89 of Chapter 15A of the General Statutes." *Id.* § 2012(a)(1) (2009) (emphasis added). Here defendant did not raise his RJA claim at the Rule 24 conference. Notably, at the Rule 24 conference, the trial court twice asked defendant whether he wanted to be heard, and on both occasions defendant stated that there was nothing to be offered for defendant. Defendant cannot complain of the trial court's failure to strictly adhere to the RJA's pretrial statutory procedures where he himself failed to follow those procedures.

We observe that the RJA authorized a defendant to raise an RJA claim at the Rule 24 pretrial conference "or in postconviction proceedings pursuant to Article 89 of Chapter 15A of the General Statutes." *Id.* Accordingly, while we express no opinion on the substance of any rights or claims defendant may have under any version of the RJA, our conclusion here is without prejudice to defendant's ability to raise any such claim in postconviction proceedings in the form of a motion for appropriate relief.

Improper Remarks in Closing Arguments at Sentencing Proceeding

Defendant next argues that the trial court erred by failing to intervene *ex mero motu* during the State's closing argument in the sentencing proceeding. We disagree.

Defendant takes exception to two statements made by prosecutors during the State's closing argument which refer to his decision not to present mitigating evidence or closing arguments. First, Assistant District Attorney Cox stated:

> Do not let the actions sway or cause you to sympathize with his course of action in this sentencing phase about argument or evidence -- do not let it manipulate you into feeling sympathy for the defendant. The judge will instruct you that you're not to take that into consideration. Do not let it sway you.

Shortly afterward, District Attorney West stated:

> Now, I ask you, as Ms. Cox did -- we do not know why the defendant has conducted himself in the sentencing hearing as he has; but, I ask you to follow the law when you go through the process. It may be to invoke sympathy. It may be a simple act of defiance, or it may be some type of manipulation. Whatever the reason, I ask you to go through this process and make your decision based on the facts and the law in this particular case.

According to defendant, the remarks were grossly improper because they expressed personal opinions, based solely on speculation and without support in the record, which attributed improper motives to defendant's decision not to present mitigating evidence or give closing arguments at the sentencing proceeding. Defendant did not object on either occasion.

"Where there is no objection, 'the standard of review to determine whether the trial court should have intervened *ex mero motu* is whether the allegedly improper argument was so prejudicial and grossly improper as to interfere with defendant's right to a fair trial.'" *State v. Gaines*, 345 N.C. 647, 673, 483 S.E.2d 396, 412 (quoting *State v. Alford*, 339 N.C. 562, 571, 453 S.E.2d 512, 516 (1995)), *cert. denied*, 522 U.S. 900, 118 S. Ct. 248, 139 L. Ed. 2d 177 (1997).

We conclude that there was no gross impropriety in the prosecutors' remarks such that the trial court was required to intervene *ex mero motu*. We first note that it was not impermissible for the prosecutors here to comment on defendant's lack of mitigating evidence. *See State v. Taylor*, 337 N.C. 597, 613, 447 S.E.2d 360, 370 (1994)[14] ("It is well established that although the defendant's failure to take the stand and deny the charges against him may not be the subject of comment, the defendant's failure to produce exculpatory evidence or to contradict evidence presented by the State may properly be brought to the jury's attention by the State in its closing argument." (first citing *State v. Reid*, 334 N.C. 551, 555, 434 S.E.2d 193, 196 (1993); then citing *State v. Young*, 317 N.C. 396, 415, 346 S.E.2d 626, 637 (1986); then citing *State v. Mason*, 315 N.C. 724, 732, 340 S.E.2d 430, 436 (1986); and then citing *State v. Tilley*, 292 N.C. 132, 143, 232 S.E.2d 433, 441 (1977))); *see also State v. Brown*, 320 N.C. 179, 204-06, 358 S.E.2d 1, 18-19 (1987) (finding no gross impropriety in

_____

[14] In February 2010, a three judge panel of the North Carolina Innocence Inquiry Commission unanimously ruled that Taylor had been wrongly convicted in 1993.

prosecutor's arguments during capital sentencing proceeding concerning the defendant's failure to produce siblings who could testify on his behalf), *cert. denied*, 484 U.S. 970, 108 S. Ct. 467, 98 L. Ed. 2d 406 (1987). Further, the thrust of both prosecutors' arguments was a simple admonition to the jury to make its decision based on the facts and the law presented in the case. To the extent that there was any impropriety in the prosecutors' suggestions that defendant's decision not to present mitigating evidence or give closing arguments was an "act of defiance" or a "manipulation" to garner sympathy, we conclude that these comments were not "so prejudicial and grossly improper as to interfere with defendant's right to a fair trial." *Gaines*, 345 N.C. at 673, 483 S.E.2d at 412 (quoting *Alford*, 339 N.C. at 571, 453 S.E.2d at 516).

## Preservation Issues

Defendant argues that the death penalty constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Section 27 of the North Carolina Constitution, and that North Carolina's capital sentencing scheme is arbitrary, vague, and overbroad. Defendant does not characterize this assertion as a preservation issue, but "we treat the assigned error as such in light of our numerous decisions that have rejected a similar argument." *State v. Hurst*, 360 N.C. 181, 205, 624 S.E.2d 309, 326, *cert. denied*, 549 U.S. 875, 127 S. Ct. 186, 166 L. Ed. 2d 131 (2006). This Court has previously considered and rejected these arguments, and we decline to depart from

our prior precedent. *See, e.g., id.* at 205, 624 S.E.2d at 327 ("This Court has held that the North Carolina capital sentencing scheme is constitutional . . . ." (citing *State v. Powell*, 340 N.C. 674, 695, 459 S.E.2d 219, 230 (1995), *cert. denied*, 516 U.S. 1060, 116 S. Ct. 739, 133 L. Ed. 2d 688 (1996))); *see also State v. Maness*, 363 N.C. 261, 294, 677 S.E.2d 796, 816-17 (2009), *cert. denied*, 559 U.S. 1052, 130 S. Ct. 2349, 176 L. Ed. 2d 568 (2010); *State v. Duke*, 360 N.C. 110, 142, 623 S.E.2d 11, 32 (2005), *cert. denied*, 549 U.S. 855, 127 S. Ct. 130, 166 L. Ed. 2d 96 (2006); *State v. Garcia*, 358 N.C. 382, 424-25, 597 S.E.2d 724, 753 (2004), *cert. denied*, 543 U.S. 1156, 125 S. Ct. 1301, 161 L. Ed. 2d 122 (2005); *State v. Williams*, 304 N.C. 394, 409-11, 284 S.E.2d 437, 448 (1981), *cert. denied*, 456 U.S. 932, 102 S. Ct. 1985, 2 L. Ed. 2d 450 (1982); *State v. Barfield*, 298 N.C. 306, 343-54, 259 S.E.2d 510, 537-44 (1979), *cert. denied*, 448 U.S. 907, 100 S. Ct. 3050, 65 L. Ed. 2d 1137 (1980), *disavowed on other grounds*, *State v. Johnson*, 317 N.C. 193, 203-04, 344 S.E.2d 775, 782 (1986).

Defendant raises five additional issues that he concedes have previously been decided by this Court contrary to his position: (1) the trial court erred by ordering defense counsel to defer to defendant's decision not to present mitigating evidence in the sentencing proceeding after finding an absolute impasse between defendant and defense counsel; (2) the trial court committed plain error under the Eighth and Fourteenth Amendments by instructing the jury that it could refuse to give effect to nonstatutory mitigating evidence if the jury deemed the evidence not to have mitigating value; (3) the trial court committed plain error by using the word

"satisfies" in capital sentencing instructions to define defendant's burden of persuasion to prove mitigating circumstances; (4) the trial court committed plain error by instructing the jurors for Issues Three and Four that each juror "may" consider mitigating circumstances found in Issue Two; and (5) when charging the commission of murder that is punishable by death, the failure to allege aggravating circumstances in the short-form murder indictment is a jurisdictional defect under North Carolina law.

Having considered defendant's arguments, we see no reason to revisit or depart from our earlier holdings. *See State v. Grooms*, 353 N.C. 50, 84-86, 540 S.E.2d 713, 734-35 (2000) (holding that when the defendant and his counsel had reached an absolute impasse, the trial court properly ordered defense counsel to defer to defendant's wishes not to present mitigating evidence and that this ruling did not deprive the defendant of effective assistance of counsel),[15] *cert. denied*, 534 U.S. 838, 122 S. Ct. 93, 151 L. Ed. 2d 54 (2001); *State v. Payne*, 337 N.C. 505, 533, 448 S.E.2d 93, 109 (1994) (finding no error in a sentencing instruction that "allowed the jury to decide that a non-statutory circumstance existed but that it had no mitigating

---

[15] Defendant asserts that the trial court's order prohibiting his counsel from presenting mitigating evidence deprived him of his Sixth Amendment right to effective assistance of counsel under *Cronic* in that it prevented "meaningful adversarial testing" of the State's penalty case. *Cronic*, 466 U.S. at 659, 104 S. Ct. at 2047, 80 L. Ed. 2d at 668. We note that while the Court in *Grooms* referenced *Strickland* in addressing and rejecting the ineffective assistance of counsel portion of the defendant's mitigating evidence argument, *Grooms*, 353 N.C. at 86, 540 S.E.2d at 735, the defendant there asserted violations of the Sixth Amendment right to counsel under both *Strickland* and *Cronic*.

value"), *cert. denied*, 514 U.S. 1038, 115 S. Ct. 1405, 131 L. Ed. 2d 292 (1995); *id.* at 531-33, 448 S.E.2d at 108-09 (holding that the use of the term "satisfy" to define a defendant's burden of proof for mitigating circumstances was not plain error); *State v. Lee*, 335 N.C. 244, 286-87, 439 S.E.2d 547, 569-70 (opining that the trial court did not err in instructing the jurors for Issues Three and Four that each juror "may" consider mitigating circumstances found in Issue Two), *cert. denied*, 513 U.S. 891, 115 S. Ct. 239, 130 L. Ed. 2d 162 (1994); *see also State v. Wilkerson*, 363 N.C. 382, 435, 683 S.E.2d 174, 206 (2009) ("This Court has repeatedly held that short-form murder indictments satisfy the requirements of our state and federal constitutions." (citing *State v. Hunt*, 357 N.C. 257, 278, 582 S.E.2d 593, 607, *cert. denied*, 539 U.S. 985, 124 S. Ct. 44, 156 L. Ed. 2d 702 (2003))), *cert. denied*, 559 U.S. 1074, 130 S. Ct. 2104, 176 L. Ed. 2d 734 (2010).

## Proportionality Review

Finally, in accordance with our statutory responsibility, we consider whether the record supports the aggravating circumstances found by the jury, whether the death sentence "was imposed under the influence of passion, prejudice, or any other arbitrary factor," and whether the death sentence "is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2) (2017).

The jury found all five of the aggravating circumstances submitted for its

consideration.[16]  The jury found the existence of three aggravating circumstances under N.C.G.S. § 15A-2000(e)(3), namely, that in three separate instances defendant had been previously convicted of a felony involving the use of violence to another person.  The jury found the existence of two additional aggravating circumstances under N.C.G.S. § 15A-2000(e)(5): first, that the capital felony was committed while the defendant was engaged in the commission of, or flight after committing, the act of first degree kidnapping; and second, that the capital felony was committed while the defendant was engaged in the commission of, or flight after committing, the act of a sexual offense with a child.  After careful consideration, we conclude that the jury's finding of these circumstances beyond a reasonable doubt was fully supported by the evidence.

Defendant presents no argument that his sentence of death should be vacated because it "was imposed under the influence of passion, prejudice, or any other arbitrary factors," *id.* § 15A-2000(d)(2), and our careful review of the record and transcripts reveals nothing that would support such a ruling.

---

[16] Two statutory mitigating circumstances were submitted—that the capacity of defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired, N.C.G.S. § 15A-2000(f)(6), and the catchall mitigating circumstance that any other circumstance arose from the evidence that any juror deems to have mitigating value, *id.* § 15A-2000(f)(9)—but neither was found by the jury.  At least one juror found the non-statutory mitigating circumstance that defendant's use of marijuana and or alcohol, and or cocaine affected his decision making, and at least one juror found the nonstatutory mitigating circumstance that defendant is a good father to his children and loves them.  The jury found beyond a reasonable doubt that these mitigating circumstances were insufficient to outweigh the aggravating circumstances.

Last, we must determine whether "the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." *Id.* § 15A-2000(d)(2). "We consider all cases which are roughly similar in facts to the instant case, although we are not constrained to cite each and every case we have used for comparison." *State v. McNeill*, 360 N.C. 231, 254, 624 S.E.2d 329, 344 (citing *State v. al-Bayyinah*, 359 N.C. 741, 760-61, 616 S.E.2d 500, 514 (2005), *cert. denied*, 547 U.S. 1076, 126 S. Ct. 1784, 164 L. Ed. 2d 528 (2006)), *cert. denied*, 549 U.S. 960, 127 S. Ct. 396, 166 L. Ed. 2d 281 (2006). "Whether the death penalty is disproportionate 'ultimately rest[s] upon the "experienced judgments" of the members of this Court.'" *al-Bayyinah*, 359 N.C. at 761, 616 S.E.2d at 514 (alteration in original) (quoting *State v. Green*, 336 N.C. 142, 198, 443 S.E.2d 14, 47, *cert. denied*, 513 U.S. 1046, 115 S. Ct. 642, 130 L. Ed. 2d 547 (1994)).

This Court has held the death penalty to be disproportionate in eight cases: *State v. Kemmerlin*, 356 N.C. 446, 487-89, 573 S.E.2d 870, 897-99 (2002); *State v. Benson*, 323 N.C. 318, 328-29, 372 S.E.2d 517, 522-23 (1988); *State v. Stokes*, 319 N.C. 1, 19-27, 352 S.E.2d 653, 663-68 (1987); *State v. Rogers*, 316 N.C. 203, 234-37, 341 S.E.2d 713, 731-33 (1986), *overruled on other grounds by Gaines*, 345 N.C. at 676-77, 483 S.E.2d at 414, *and by State v. Vandiver*, 321 N.C. 570, 573, 364 S.E.2d 373, 375 (1988); *State v. Young*, 312 N.C. 669, 686-91, 325 S.E.2d 181, 192-94 (1985); *State v. Hill*, 311 N.C. 465, 475-79, 319 S.E.2d 163, 170-72 (1984); *State v. Bondurant*, 309 N.C. 674, 692-94, 309 S.E.2d 170, 181-83 (1983); and *State v. Jackson*, 309 N.C. 26,

45-47, 305 S.E.2d 703, 716-18 (1983). We conclude that this case is not substantially similar to any of those cases.

Here defendant kidnapped a five-year-old child from her home and sexually assaulted her before strangling her and discarding her body under a log in a remote area used for field dressing deer carcasses. We note that this Court "ha[s] never found a death sentence disproportionate in a case involving a victim of first-degree murder who also was sexually assaulted." *State v. Kandies*, 342 N.C. 419, 455, 467 S.E.2d 67, 87 (citing *State v. Payne*, 337 N.C. 505, 537, 448 S.E.2d 93, 112 (1994), *cert. denied*, 514 U.S. 1038, 115 S. Ct. 1405, 131 L. Ed. 2d 292 (1995)), *cert. denied*, 519 U.S. 894, 117 S. Ct. 237, 136 L. Ed. 2d 167 (1996). Further, "[t]his Court has deemed the (e)(3) aggravating circumstance," of which the jury here found three separate instances, "standing alone, to be sufficient to sustain a sentence of death." *al-Bayyinah*, 359 N.C. at 762, 616 S.E.2d at 515 (citing *State v. Bacon*, 337 N.C. 66, 110 n.8, 446 S.E.2d 542, 566 n.8 (1994), *cert. denied*, 513 U.S. 1159, 115 S. Ct. 1120, 130 L. Ed. 2d 1083 (1995)). Similarly, we have held that the (e)(5) aggravating circumstance, of which the jury here found two separate instances based upon the commission, or flight after commission of, kidnapping and sex offense, to be sufficient to affirm a sentence of death. *See State v. Zuniga*, 320 N.C. 233, 274-75, 357 S.E.2d 898, 923-24, *cert. denied*, 484 U.S. 959, 108 S. Ct. 359, 98 L. Ed. 2d 384 (1987). Moreover, the jury found defendant guilty of both felony murder and first-degree murder committed with malice, premeditation, and deliberation. While a conviction based solely upon felony

murder is punishable by a sentence of death, "a finding of premeditation and deliberation indicates a more calculated and cold-blooded crime for which the death penalty is more often appropriate." *State v. Phillips*, 365 N.C. 103, 150, 711 S.E.2d 122, 154 (2011) (quoting *Taylor*, 362 N.C. at 563, 669 S.E.2d at 276 (internal quotation marks omitted)), *cert. denied*, 565 U.S. 1204, 132 S. Ct. 1541, 182 L. Ed. 2d 176 (2012).

In comparing defendant's case with those in which this Court has found the death penalty to be proportionate, *al-Bayyinah*, 359 N.C. at 762, 616 S.E.2d at 515, we conclude that defendant's case is more analogous to these cases. *See, e.g.*, *State v. Lane*, 365 N.C. 7, 39-40, 707 S.E.2d 210, 230 (holding a sentence of death proportionate when the "defendant confessed to taking advantage of a trusting five-year-old child, then raping and sodomizing her before putting her, while still alive, in a garbage bag sealed with duct tape, wrapping her in a tarp, and discarding her body in a creek"), *cert. denied*, 565 U.S. 1081, 132 S. Ct. 816, 181 L. Ed. 2d 529 (2011).

Conclusion

For the foregoing reasons we conclude that defendant received a fair trial and capital sentencing proceeding free of prejudicial error, and that the death sentence recommended by the jury and imposed by the trial court is not excessive or disproportionate.

NO ERROR.